STATE OF NORTH CAROLINA v. DEAN TAYLOR DARROCH

No. 102A81

(Filed 3 March 1982)

1. **Criminal Law § 14— jurisdiction—accessory before the fact—acts in another state—felony committed within this State**

Former G.S. 14-5, which asserted jurisdiction over the crime of accessory before the fact whenever the principal felony occurred in this State, did not violate the Sixth Amendment to the U. S. Constitution; therefore, the State could constitutionally assert jurisdiction over a defendant who committed the crime of accessory before the fact to a murder committed within this State when the counseling, procuring or commanding of another to commit the murder took place in Virginia.

2. **Criminal Law § 14— jurisdiction—accessory before the fact to murder—murder committed within this State—sufficiency of evidence**

In a prosecution for accessory before the fact to a murder by hiring others in Virginia to commit the murder, the evidence was sufficient to show that the murder was committed in North Carolina so as to give the courts of this State jurisdiction over defendant where one witness testified that the victim was killed in his home in Harnett County and another witness testified that the victim was killed in his home in Bunnlevel, since the appellate court will take judicial notice of the fact that Bunnlevel is in Harnett County and that Harnett County is located in this State.

3. **Criminal Law § 14— theory of jurisdiction challenged—question of law for court**

In a prosecution for accessory before the fact to murder by hiring others in Virginia to commit a murder in North Carolina, the trial court properly refused to instruct the jury that the State had the burden of proving beyond a reasonable doubt that North Carolina had jurisdiction over the offense where defendant challenged only the *theory* of jurisdiction relied on by the State and not the *facts* which the State contended supported jurisdiction, since the question of whether the theory supported jurisdiction was a matter of law for the court.

4. **Criminal Law § 10; Homicide § 2— accessory before the fact to second degree murder**

Defendant could properly be convicted of being an accessory before the fact to second degree murder.

Justice MITCHELL took no part in the consideration or decision of this case.

ON appeal of right pursuant to G.S. 7A-27(a) from life sentence imposed by *Farmer, Judge*, on verdict of guilty of accessory before the fact to murder. The judgment was entered at

the 30 March 1981 Criminal Session of Superior Court, HARNETT County.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Sarah C. Young, for the State.*

*DeMent, Askew & Gaskins, by Johnny S. Gaskins, for defendant-appellant.*

CARLTON, Justice.

The State's evidence tended to show that defendant, a Virginia resident, while in Virginia, hired two persons to murder her estranged husband and that he was murdered in this state by the persons so hired. Defendant was convicted as an accessory before the fact to the murder. The most important question raised by this appeal is whether the State of North Carolina may constitutionally assert jurisdiction over a defendant who commits the crime of accessory before the fact to a felony committed within the state when the counselling, procuring or commanding took place without the state. We affirm the trial court's ruling that such an assertion of jurisdiction is constitutional. We also address other arguments presented by defendant and find no error in her trial for the crime of accessory before the fact to murder.

I

At trial the State presented the testimony of the two principals to the crime. Defendant's sister, Barbara Jean Crowder, and nephew, James Donald Wells, testified pursuant to an arrangement which allowed each of them to plead guilty to second degree murder. Crowder was told she would receive a forty-year prison sentence and Wells was told he would receive a sixty-year sentence for murder and a concurrent ten-year sentence for conspiracy.

At the time of the murder defendant and her husband, Raeford Mitchell Darroch, were separated. Defendant lived in Danville, Virginia, and her husband lived in Bunnlevel, North Carolina. Mr. Darroch was killed on or about 10 November 1979.

In September of 1979 defendant asked Wells if he would kill her husband. She told Wells that she wanted him killed because he had a drinking problem and was harassing her and her boy-

friend. She also mentioned that he had not been paying child support, that he was going to lose his job, and that if he lost his job he would lose his life insurance. Wells told her that he would do it. Some two weeks later, defendant and Wells again discussed the matter and Wells told defendant that if she got some Valium that he would use it to kill Mr. Darroch. This conversation took place at defendant's home in Danville.

On the Tuesday following this conversation, Wells went to defendant's home. She gave him twenty Valium pills which she had obtained from a doctor. Wells purchased two pint bottles of liquor. He poured out half of one of the bottles, put the Valium in that bottle of liquor and drove to Mr. Darroch's house in Harnett County. He and Mr. Darroch drank the liquor from the full bottle and watched a ball game. When the ball game was over, Wells poured out the liquor containing the Valium because he "just couldn't kill Raeford." He drove back to Virginia that night. A few days after his return he informed defendant that he had gone to Mr. Darroch's home but couldn't do it.

Wells saw defendant again during the first weekend in November of 1979. He, defendant and Crowder took a drive and discussed killing Mr. Darroch. Wells again agreed to kill him and Crowder agreed to help. They decided to use a shotgun so the projectile could not be traced. Defendant stated that the killing of her husband would be "profitable for everybody." Defendant mentioned that she was going to give Wells an acre of land.

Wells obtained a .12 guage shotgun from a friend. On Friday night, 9 November 1979, after talking with defendant, Wells and Crowder drove to Mr. Darroch's home in Bunnlevel. They left Danville at approximately 11 p.m. They stopped near Fuquay-Varina to call defendant to ask if she still wanted Mr. Darroch killed. She told them that she still wanted it done. They drove on to Mr. Darroch's house. He was asleep on the living room sofa. Wells entered the house by climbing through a kitchen window and Crowder handed him the shotgun. Crowder waited in the car while Wells shot Mr. Darroch in the head. Wells exited the house with the shotgun and Mr. Darroch's wallet.

He and Crowder then drove back to Danville to the motel where defendant was working. They arrived at approximately

5:30 or 6:00 a.m. and told defendant that Wells had killed her husband.

Wells was arrested on 28 April 1980 and Crowder on 6 August 1980. They were both charged with first degree murder of Raeford Darroch and with conspiracy and were told that they faced the death penalty. Both were allowed to plead guilty to second degree murder in exchange for their testimony against defendant; Wells also pleaded guilty to the charge of conspiracy.

Raeford Darroch's life was insured by a policy obtained through his employer in the amount of $27,000 which provided double indemnity benefits for a violent death other than one self-inflicted. Had Mr. Darroch lost his job, the policy would have terminated thirty-one days after his last day of employment. By the terms of the policy the benefits were payable to the insured's widow, the defendant. Defendant applied for those benefits on 27 November 1979.

The personnel manager for defendant's employer testified that the deceased had worked only two weeks between June 1979 and the date of his death. A conference had been held with Mr. Darroch to discuss his attendance and he was told that if he did not return to his job he would be terminated.

Defendant took the stand in her own behalf. She denied that she had ever talked with Wells or Crowder about killing her estranged husband. She testified that she knew that her husband had some life insurance but that she did not learn until after his death that she was entitled to the benefits.

Defendant was found guilty by a jury of accessory before the fact to murder, G.S. § 14-5 (1969),[1] and was given the mandatory life sentence, G.S. § 14-6 (Cum. Supp. 1979).[2]

---

1. This statute was repealed effective 1 July 1981 by Law of June 25, 1981, ch. 686, 1981 N.C. Sess. Laws --- (1981). G.S. 14-5.2 now defines the criminal liability of accessories before the fact:

> All distinctions between accessories before the fact and principals to the commission of a felony are abolished. Every person who heretofore would have been guilty as an accessory before the fact to any felony shall be guilty and punishable as a principal to that felony. However, if a person who heretofore would have been guilty and punishable as an accessory before the fact is convicted of a capital felony, and the jury finds that his conviction was based sole-

## II

[1]  Defendant's primary contention on this appeal is that a portion of the statute under which she was convicted, former G.S. ·14-5,[3] is unconstitutional because it purports to assert jurisdiction over actions which occur outside the state in violation of the sixth amendment to the United States Constitution. Defendant timely raised this issue by a motion to dismiss in the trial court prior to trial.

Former G.S. 14-5 made criminal in this state the counselling, procuring or commanding *outside the state* of another to commit a felony *within the state*. Thus, under this statute, a person could

ly on the uncorroborated testimony of one or more principals, coconspirators, or accessories to the crime, he shall be guilty of a Class B felony.

2. This statute was repealed effective 1 July 1981 by Law of June 25, 1981, ch. 686, 1981 N.C. Sess. Laws --- (1981). Persons who counsel, procure or command another to commit a felony are now principals and are punished as such. G.S. § 14-5.2 (1981).

3. Former G.S. 14-5 provides:

If any person shall counsel, procure or command any other person to commit any felony, whether the same be a felony at common law or by virtue of any statute, the person so counseling, procuring or commanding shall be guilty of a felony, and may be indicted and convicted, either as an accessory before the fact to the principal felony, together with the principal felon, or after the conviction of the principal felon; or he may be indicted and convicted of a substantive felony, whether the principal felon shall or shall not have been previously convicted, or shall or shall not be amenable to justice, and may be punished in the same manner as any accessory before the fact to the same felony, if convicted as an accessory, may be punished. *The offense of the person so counseling, procuring or commanding, howsoever indicted, may be inquired of, tried, determined and punished by any court which shall have jurisdiction to try the principal felon, in the same manner as if such offense had been committed at the same place as the principal felony or where the principal felony is triable, although such offense may have been committed at any place within or without the limits of the State.* In case the principal felony shall have been committed within the body of any county, and the offense of counseling, procuring or commanding shall have been committed within the body of any other county, the last-mentioned offense may be inquired of, tried, determined, and punished in either of such counties: Provided, that no person who shall be once duly tried for any such offense, whether as an accessory before the fact or as for a substantive felony, shall be liable to be again indicted or tried for the same offense.

(Emphasis added.) This statute was repealed effective 1 July 1981. See note 1, *supra.*

be guilty of the crime of accessory before the fact within this state if the principal offense occurred here. According to defendant, this result contravenes the sixth amendment, which provides that "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. The thrust of defendant's argument is that this state, by virtue of the sixth amendment, cannot exercise jurisdiction over crimes occurring beyond its territorial limits. Since all of her acts on which the charge of accessory before the fact is based took place in Virginia, defendant contends, this state had no jurisdiction to try her for her crime. We disagree and hold that regardless of where the accessorial acts take place this state may constitutionally assert jurisdiction over that crime as long as the principal felony occurs here.

### A.

Defendant's argument that this state may not assert jurisdiction over her crime is based on the territorial principle of jurisdiction. Under this theory, a state's jurisdiction over criminal matters cannot extend beyond its territorial boundaries. The Apollon, 22 U.S. (9 Wheat.) 362, 370, 6 L.Ed. 111, 113 (1824); Berge, *Criminal Jurisdiction and the Territorial Principle,* 30 Mich. L. Rev. 238 (1932). Under the historical strict territorial principle, a state court had jurisdiction only over those crimes which occurred entirely within that state's boundaries; if any essential element occurred in another state, neither possessed jurisdiction over the criminal offense. 1 M. Hale, *The History of the Pleas of the Crown* 426 (1778); *see United States v. McGill,* 4 U.S. (4 Dall.) 426 (1806). Under this view of jurisdiction, only one state could have jurisdiction over a particular crime. *See Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287, 293 (1812).

This strict theory of territorial and exclusive jurisdiction has been gradually relaxed by appellate courts over the years to afford a more elastic, and more practical, jurisdictional theory. One such example of relaxation is the localization theory.

When faced with a situation in which the constituent acts of a crime occur in different states, many courts have sought to "localize" the entire crime in the state where the ultimate harm occurred. In *People v. Adams,* 3 Denio (N.Y.) 190 (1846), *aff'd,* 1

Comstock (N.Y.) 173 (1848), defendant was charged with obtaining money and property by false pretenses. In *Adams*, defendant through innocent agents in New York made false representations to a New York business and thereby fraudulently obtained money. Defendant admitted the false pretenses but contended that the courts of New York had no jurisdiction over his crime because he was at all relevant times in the State of Ohio. Although the supreme court agreed that its jurisdiction was limited to crimes committed within the State of New York, it held that personal presence of the defendant was not indispensable. The court reasoned that the crime had been committed in New York because it was there that defendant's scheme came to fruition and that jurisdiction over the crime necessarily implied jurisdiction over the criminal.

Courts in other jurisdictions have predicated jurisdiction over a nonresident defendant on the theory of constructive presence. Under this theory, the defendant is deemed to accompany the force which causes the actual harm which occurs in the forum state. Traditionally, constructive presence has been confined in two situations: (1) when the defendant is deemed to have accompanied the instrumentality, *e.g.*, *Simpson v. State*, 92 Ga. 41, 17 S.E. 984 (1893), and (2) when the defendant is deemed to have accompanied the agent, *e.g.*, *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911). In *Simpson*, the defendant, while in South Carolina, fired across the state line at a person in Georgia. In affirming the conviction for assault with intent to commit murder, the Georgia court stated:

> Of course, the presence of the accused within this State is essential to make his act one which is done in this State; but the presence need not be actual. It may be constructive. The well established theory of law is, that where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual. . . . So, if a man in the State of South Carolina criminally fires a ball into the State of Georgia, the law regards him as accompanying the ball, and being represented by it, up to the point where it strikes. . . .
>
> . . . [T]he act of the accused did take effect in this State. He started across the river with his leaden messenger, and

was operating it up to the moment when it ceased to move, and was therefore, in a legal sense, after the ball crossed the State line up to the moment that it stopped, in Georgia.

92 Ga. at 43, 46, 17 S.E. at 985, 986. Unlike the New York court in *Adams*, the Georgia court considered presence within the state as necessary to jurisdiction. It found that presence through use of a legal fiction: constructive presence.

In *Strassheim*, defendant challenged the jurisdiction of the Michigan courts to try him for obtaining funds from the state by false pretenses. At the time the money was obtained in Michigan, defendant was outside the state. The person who obtained the funds in Michigan, one Armstrong, had agreed to participate in defendant's plan to defraud the state. In holding that Michigan courts had jurisdiction to try the defendant the Supreme Court stated:

> If a jury should believe the evidence and find that Daily did the acts that led Armstrong to betray his trust, deceived the Board of Control, and induced by fraud the payment by the State, the usage of the civilized world would warrant Michigan in punishing him, although he never had set foot in the State until after the fraud was complete. Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power.

221 U.S. at 284-85, 31 S.Ct. at 560, 55 L.Ed. at 738. This Court made clear that one who procures a guilty agent to commit a crime in another state may be punished as a principal to the crime in the other state and that there is no constitutional prohibition to such an assertion of jurisdiction.

Still another method employed to support the finding of jurisdiction when some elements of the crime occur outside the state is the expanded definition of the crime. In *Worthington v. State*, 58 Md. 403 (1882), the defendant stole goods in West Virginia and brought them into the State of Maryland. He was arrested there and charged with larceny. The supreme court affirmed his conviction of that crime, reasoning that larceny is a continuing offense and that every asportation of the property was

a new offense. Because the act of bringing stolen goods into Maryland was an asportation constituting a new offense, the court reasoned that defendant had committed a larceny within Maryland and was punishable there. *Id.* at 409. *Contra, e.g. Strouther v. Commonwealth,* 92 Va. 789, 22 S.E. 852 (1895) (rejecting this definition of larceny). This Court has also rejected the Maryland court's definition of larceny, refusing to impose punishment for larceny of a horse when the animal was stolen in Ohio and was later brought into this state. *State v. Brown,* 2 N.C. (1 Hayw.) 100 (1794).

The cases discussed above concern prosecution for the principal offense, and we are here concerned with prosecution as an accessory. At the time of defendant's actions, the crime of accessory before the fact was a separate substantive offense under North Carolina law. *State v. Small,* 301 N.C. 407, 272 S.E. 2d 128 (1980).[4] Defendant contends that this distinction is important because under our definition of the substantive crime of accessory before the fact, the crime must occur, and therefore jurisdiction must exclusively vest, in the state where the accessorial acts were committed.

Defendant is not without case law support for her argument. Indeed, in *Johns v. State,* 19 Ind. 421 (1862), the court was faced with facts similar to those now before us and held that Indiana had no jurisdiction over defendant's crime of accessory before the fact when the accessorial acts occurred outside the state and the principal felony occurred within the state. This case, however, was not decided on constitutional grounds but on the basis of a strict territorial approach to jurisdiction. Excerpts from *Johns* are illustrative of that court's reliance on the territorial principle:

It may be assumed, as a general proposition, that the criminal laws of a State do not bind, and can not affect, those out of the territorial limits of the State.

Each State, in respect to each of the others, is an independent sovereignty, possessing ample powers, and the exclusive right, to determine, within its own borders, what shall be tolerated, and what prohibited; what shall be deemed

---

4. As stated above in note 1, an accessory before the fact is now guilty and punishable as a principal by virtue of G.S. 14-5.2.

innocent, and what criminal; its powers being limited only by the Federal Constitution, and the nature and objects of government. While each State is thus sovereign within its own limits, it can not impose its laws upon those outside the limits of its sovereign power. Our own constitution has expressly fixed the boundaries of its sovereignty. It provides, after having defined the geographical boundaries of the State, that "The State of *Indiana* shall possess jurisdiction and sovereignty coextensive with the boundaries declared in the preceding section; and shall have concurrent jurisdiction, in civil and criminal cases, with the State of *Kentucky* on the *Ohio* river, and the State of *Illinois* on the *Wabash*, so far as said rivers form the common boundary between this State and the said States respectively." Constitution, art. 14, sec. 2.

But, while it is clear that the criminal law of a State can have no extra-territorial operation, it is equally clear that each State may protect her own citizens in the enjoyment of life, liberty, and property, by determining what acts, within her own limits, shall be deemed criminal, and by punishing the commission of those acts. And the right of punishment extends not only to persons who commit infractions of the criminal law *actually* within the State, but also to all *persons who commit* such infractions as are, in *contemplation of law*, within the State.

. . . .

. . . Two circumstances may be noticed in reference to all the cases that have come under our observation: 1. The crime has been deemed, in law, to have been committed in the State where it was punished, although the perpetrator, at the time of its commission, may have been personally out of the State; and 2. The party punished has been held to be the person who *committed* it; that is, he has been held to be the principal, and not merely an accessory before the fact. Indeed, in no justly legal sense can it be said, that a man who, in one State, procures a responsible party to go out of that State into another, and there commit a crime, *commits* any crime *within the latter State.*

*Id.* at 423-24, 426-27. (Emphasis in original.)

Similarly, the court in *State v. Sigh*, 38 Del. 362, 192 A. 682 (1937), held that one whose accessorial acts occurred outside the state could not be tried in the state where the principal felony occurred. The Delaware court considered presence within the state to be essential to jurisdiction. Although it recognized that constructive presence was sufficient to give jurisdiction, the court considered that defendant's procuring of a guilty agent to commit the felony was not such an act as would establish constructive presence. By its reliance on presence, actual or constructive, as a prerequisite to jurisdiction this court revealed its view of jurisdiction as being essentially and strictly territorial.

Under the strict territorial approach, it became the generally accepted law that one who procures the commission of a felony in another state by use of an inanimate object or through an innocent agent was liable as a principal in the state where the principal felony occurs; if the agent who commits the act constituting the felony shared in the guilty plan, the procurer was deemed an accessory before the fact over whom the state where the principal crime occurred had no jurisdiction. *People v. Werblow*, 241 N.Y. 55, 148 N.E. 786 (1925); W. La Fave & A. Scott, *Criminal Law* 117-21 (1972); 21 Am. Jur. 2d Criminal Law §§ 343-47 (1981); Berge, *supra*, 30 Mich. L. Rev. 238. Thus, under the majority rule, this state would have no jurisdiction to try this defendant because her accessorial acts occurred in another state.

Despite the support for defendant's argument, we are not persuaded. In our opinion, the Constitution requires only that the state have a legitimate interest peculiar to itself in punishing the accessorial offense. Former G.S. 14-5 is not violative of the sixth amendment guarantee because it requires that the principal felony occur within the boundaries of this state. As stated by Justice Holmes in *Strassheim*, "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within, justify a State in punishing the cause of the harm as if [the defendant] had been present at the effect . . . ." 221 U.S. at 284-85, 31 S.Ct. at 560, 55 L.Ed. at 738. Former G.S. 14-5 does no more than allow this state to punish the cause, the accessorial acts, of the harm occurring in this state.

That *Strassheim* involved punishment of the out-of-state defendant as a principal rather than as an accessory is not determi-

native. The relation of the defendant in *Strassheim* to the forum jurisdiction is the same as that of the defendant here to this state. Both, while outside the state, procured an agent who shared in the guilty plan to commit a felony within the state. Neither defendant was present within the state at the time the principal crime was committed. See *Strassheim*, 221 U.S. at 281, 84, 31 S.Ct. 559-60, 55 L.Ed. at 736-38. The United States Supreme Court decided that such facts were sufficient to allow the state in which the principal felony was committed constitutionally to punish as a principal the defendant who remained outside the state. We can see no reason why these facts would not also justify punishment as an accessory. Defendant's contention that a contrary result would render meaningless the law in this jurisdiction that accessory before the fact is a separate substantive offense from the principal act is simply not persuasive. How a state chooses to label a crime cannot be relevant to jurisdiction. To conclude otherwise would be to place form above substance.

Although we adhere to the territorial principle of jurisdiction, we think that a flexible, rather than a strict, approach is necessary. In our opinion, the cases which utilize the "localization," constructive presence and expanded definition of crime rationales, while perhaps reaching the correct results, fail to recognize that it is the relationship of the defendant's acts to the forum state which justifies the assertion of jurisdiction.

The desirability of recognizing the legal fictions for what they are in favor of a frank recognition of the relevant factors has long been urged by members of the judiciary and by commentators. In *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), the Supreme Court upheld the right of the courts of the District of Columbia to try all participants in a conspiracy even though not all had been within its territorial limits. The justification for the jurisdiction was constructive presence based on the liability of all conspirators for the overt acts of coconspirators committed in the District in furtherance of the object of the conspiracy. Justice Holmes, in dissent, argued against the use of constructive presence to find jurisdiction:

> To speak of constructive presence is to use the language of fiction, and so to hinder precise analysis. When a man is said to be constructively present where the consequences of

an act done elsewhere are felt, it is meant that for some special purpose he will be treated as he would have been treated if he had been present, although he was not. For instance, if a man, acting on one State sets forces in motion that kill a man in another, or produces or induces some consequence in that other that it regards as very hurtful and wishes to prevent, the latter State is very likely to say that if it can catch him it will punish him, although he was not subject to its laws when he did the act. *Strassheim v. Daily,* 221 U.S. 280, 285. But as States usually confine their threats to those within the jurisdiction at the time of the act, . . . the symmetry of general theory is preserved by saying that the offender was constructively present in the case supposed. *Burton v. United States,* 202 U.S. 344, 389. We must not forget facts, however. He was not present in fact, and in theory of law he was present only so far as to be charged with the act.

*Id.* at 386, 32 S.Ct. at 809, 56 L.Ed. at 1133.

In his article on criminal jurisdiction, Wendell Berge argued for "a frank acceptance of elastic jurisdictional principles which are adaptable to the realities of modern crime situations." Berge, *supra,* 30 Mich. L. Rev. at 239. In his conclusion he stated:

From the study herein made the conclusion is irresistible that if the constituent acts of a given crime occur in more than one state, each such state has an equally valid claim to jurisdiction over the whole crime. Such extra-territorial elements should be frankly recognized by courts and no attempt should be made to cover them with legal fictions.

It has been seen that the trend is unmistakably away from absolutely logical territorial restrictions on criminal jurisdiction, and toward a realistic treatment of the problem. This must lead and is leading to more elastic jurisdictional principles to apply to modern crime situations. Accepting the territorial principle, still it should be pragmatically applied. As noted above, policy has dictated certain exceptions to the territorial principle. Policy also dictates that the territorial principle should be liberalized whenever real situations in a world of rapid change demand such liberalization.

*Id.* at 269.

A need for relaxation of the strict territorial principle of criminal jurisdiction was recognized as early as 1880. In that year, Francis Wharton argued for modification of the territorial theory. He reasoned that modern developments rendered obsolete the traditional importance assigned to boundaries:

> The great discoveries of recent days, by which the obstacles of space are surmounted, call for a reconsideration of our old conceptions of criminal jurisdiction. In the early period of English common law, all business transactions were by word of mouth, or by tokens or writings exchanged between the immediate parties, face to face. Agencies, indeed, might be constituted, but agents traveled slowly, and carried with them explicit limitations of their powers. Commercial paper was next introduced; but this, also, was subject to the slow transit of those days; and if a forgery was concocted in one country for operation in another, such an occurrence was too rare to make it the object of any modification of the existing law. Now, however, there is scarcely a business transaction which is not more or less affected by information conveyed instantaneously from a foreign land; information as to which fraud is always possible, and concerned in the concoction or transmission of which there may be always persons, resident in other countries, who may do acts violating the penal laws of the country in which the information is to operate. In old times, also, almost the only way of inflicting a physical injury on another was by direct personal attack. Now there are many ways in which such an injury may be inflicted, when the aggressor is in one land and the victim in another. When lines separating states are so purely formal as are those of the American Union, there are innumerable cases in which a pistol shot in one state may inflict an injury in another state. And even where the most formidable natural boundaries interpose between state and state, these boundaries may be readily surmounted by adventurous crime.

Wharton, *Conflict of Criminal Laws*, 1 Criminal Law Magazine, 687, 689-90 (1880).

The commission of the principal felony within this state's territorial boundaries at the behest of the defendant is sufficient to support this state's jurisdiction over her acts. The harm sought

by this defendant took place in this state and punishment of the person who procured it is a legitimate interest peculiar to this state. Whether defendant is also punishable under the laws of the state where her accessorial acts occurred is of no consequence to the issue of this state's jurisdiction. Thus, we hold that former G.S. 14-5, which asserts jurisdiction over the crime of accessory before the fact whenever the principal felony occurs here, is constitutional. Our rationale and holding do not abrogate the territorial principle but, rather, view the theory as flexible and adaptable to modern crime situations. Defendant's crime here did have a territorial relationship to this state: the murder which she counselled, procured and commanded was committed within its boundaries.

G.S. 14-5 permits a constitutional assertion of jurisdiction over the crime of accessory before the fact, and there is sufficient territorial relationship between defendant's accessorial acts and the State of North Carolina.

### III

[2] Defendant's next contention on appeal is that the trial court erred in refusing to dismiss the charge against her. This assignment is based on two jurisdictional contentions: (1) the offense of accessory before the fact occurred, if at all, in Virginia and that state has exclusive jurisdiction over her crime; (2) North Carolina has no jurisdiction over her crime because there is no evidence that the principal offense occurred in North Carolina.

Defendant's first contention was disposed of above; the commission of the principal offense in this state is sufficient to support jurisdiction over the crime of accessory before the fact to that offense.

Defendant's second contention is likewise without merit. Although neither State witness Crowder nor Wells stated directly that they had murdered defendant's husband in North Carolina, there is ample evidence that the murder occurred in this state in Harnett County. Crowder testified that Mr. Darroch was living in Harnett County at the time of his death and that Mr. Darroch was shot in his home. Wells testified that Mr. Darroch lived in Bunnlevel and that he was killed at his, Mr. Darroch's, home. This Court may, and does, take judicial notice of the fact that Bunn-

level is in Harnett County and Harnett County is located in this state. *See State v. Glasgow*, 1 N.C. (Cam. & Nor.) 264 (1800). Thus, contrary to defendant's assertion, there is ample evidence that the principal offense occurred in North Carolina.

### IV

[3] By her next assignment defendant contends that the trial court erred in failing to instruct the jury that the State had the burden of proving beyond a reasonable doubt that North Carolina had jurisdiction over the offense.

This assignment is based on trial court's refusal to give the following instruction to the jury:

> Ladies and Gentlemen of the jury, the State is further required to prove beyond a reasonable doubt that it has jurisdiction to try the defendant for the offense of accessory before the fact of murder. The State must satisfy you beyond a reasonable doubt that the substantive offense of accessory before the fact of murder occurred in North Carolina. The burden is on the prosecution to prove that each element of the offense of accessory before the fact of murder occurred in North Carolina. The Court does not have jurisdiction to try the defendant for the offense with which she is charged unless the prosecution satisfies you beyond a reasonable doubt that the offense of accessory before the fact of murder occurred in North Carolina.

Defendant argues that because jurisdiction was in issue and the jury was not told that the State had the burden of proof on that issue, she is entitled to a new trial. We reject her argument.

In *State v. Batdorf*, 293 N.C. 486, 238 S.E. 2d 497 (1977), this Court recognized that the criminal jurisdiction of the state is territorially restricted. We held that in cases where this state's jurisdiction is challenged, the State must prove beyond a reasonable doubt that the crime with which the accused is charged occurred in North Carolina. Defendant in *Batdorf* was charged with murder of a truck driver. The only evidence presented by the State on the question of where the murder occurred was that the body was found in North Carolina. The evidence showed that the truck driver initiated his final trip in Ohio and that his truck had been driven into North Carolina.

Defendant took the stand in his own behalf, admitted the killing but claimed that the murder took place within a few hours after leaving Ohio and long before he came into North Carolina. This Court held that under those facts the State had not carried its burden of proving that the crime occurred within the state's territorial limits. Unlike the situation in *Batdorf*, we are here concerned with where the principal offense, the basis of jurisdiction, occurred, not where this defendant's acts occurred. Also unlike *Batdorf*, in this case there was no dispute as to where the principal offense, the murder, occurred. Because the locus of the principal offense was not challenged, no instruction on the burden of proof on that issue was required.

Additionally, defendant's proffered instruction bases the jurisdiction of this state on where her accessorial acts occurred, a basis we have previously discussed and rejected.

While *Batdorf* still represents the law in this state on the burden of proof on jurisdiction, it is applicable only when the facts on which the State seeks to base jurisdiction are challenged. In this case, defendant challenged not the *facts* which the State contended supported jurisdiction, but the *theory* of jurisdiction relied upon by the State. Whether the theory supports jurisdiction is a legal question; whether certain facts exist which would support jurisdiction is a jury question.

For the reasons set out above we find this assignment of error to be without merit.

V

In a related assignment defendant contends that the jury should have been allowed to return a special verdict indicating that North Carolina had no jurisdiction. As discussed above, the fact on which jurisdiction was based — the commission of the principal felony in this state — was not in issue. Defendant's challenge goes to the theory of jurisdiction, a question for the courts. Because there was no factual issue existing as to the basis of jurisdiction, there was no need to allow the jury to return a special verdict.

VI

[4] Defendant's final assignment alleges that the trial court erred in instructing the jury because the instructions allowed the

jury to convict her of being an accessory before the fact to second degree murder. The argument that there cannot be an accessory before the fact to second degree murder was addressed and rejected in *State v. Benton*, 276 N.C. 641, 174 S.E. 2d 793 (1970). Defendant now requests that we reverse the *Benton* decision arguing only that the "logic" of that decision "is not sound." It is enough to say that we find nothing illogical in the reasoning supporting the decision in *Benton* and decline defendant's request to change the law of this state for her benefit.

## VII

In conclusion, we hold that the portion of G.S. 14-5 in question represents a constitutional assertion of jurisdiction and that this defendant was properly brought before the courts of this state to answer for her crime. She received a fair trial, free from prejudicial error. In all respects, we find in her trial and conviction

No error.

Justice MITCHELL took no part in the consideration or decision of this case.