607 S.E.2d 437

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Michael O'Dell DENNIS, Defendant Below, Appellant.**

**No. 31578.**

Supreme Court of Appeals of West Virginia.

Submitted March 31, 2004.

Decided Dec. 1, 2004.

This case involves an appeal by Michael O'Dell Dennis (hereinafter referred to as "Appellant") of his conviction by jury trial in the Circuit Court of Ohio County on August 22, 2002, of the offenses of kidnapping, second degree robbery, two counts of second degree sexual assault, violating a domestic violence protective order and domestic battery.[1] In challenging his convictions, Appellant claims the trial court committed error by: failing to dismiss the sexual assault and robbery charges because any relevant act occurred in Ohio rather than West Virginia; refusing to declare a mistrial when it became known during trial that the mother of one of the jurors formerly worked for the prosecutor and was working for the circuit clerk's office at the time of trial; not permitting Appellant to offer expert testimony to rebut the state's evidence about characteristics of battered woman's syndrome (hereinafter referred to as "BWS"); allowing the introduction of impermissible hearsay evidence through various witnesses who repeated the victim's statements; allowing admission of testimony of prior crimes, wrongs or acts of Appellant; permitting a nurse to testify as an expert regarding the victim's injuries; failing to recognize that law enforcement conducted an inadequate investigation; and not taking corrective action to instruct the jury about improper remarks of the prosecutor.

For the reasons set out below, the judgment order is affirmed in part and reversed in part, with the case remanded to the lower court for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

Appellant is in his early twenties and is from New Martinsville, located in Wetzel County West Virginia. The accuser or victim in this case, Raina Sands, is from the New Martinsville–Paden City area and she met and began dating Appellant while she

Scott R. Smith, Prosecuting Attorney, William J. Ihlenfeld, II, Assistant Prosecuting Attorney, Wheeling, West Virginia, Attorneys for the Appellee.

Mark A. Blevins, The Law Offices of Mark A. Blevins, Wheeling, West Virginia, Attorneys for the Appellant.

1. The October 28, 2002, sentencing order shows that Appellant received a life sentence with mercy for kidnapping, a five-to-eighteen-year sentence for second degree robbery, a ten to twenty-five year sentence for each second degree sexual assault conviction, a one year sentence for violation of a protective order and a one year sentence for domestic battery. The kidnapping and sexual assault sentences were ordered to run consecutively and the remaining sentences to run concurrently with the kidnapping and sexual assault sentences.

was still in high school. Although they are not married, Appellant and Ms. Sands are the parents of a two-year-old son. According to Ms. Sands, the relationship with Appellant had deteriorated after the baby was born. What occurred between the couple on July 23 and 24, 2001, when the crimes at issue occurred, as well as the events in the months immediately preceding the dates in July, are largely in dispute.

Explaining how Appellant's behavior became controlling and possessive in the months prior to the dates in July 2001, Ms. Sands testified about specific incidences where Appellant used force to keep her away from other people. In order to make her comply with his wishes, Ms. Sands said that Appellant had at one point placed his hand over her mouth and nose so that she could not breathe; other examples included holding her captive in a house and slapping her with his hands and hitting her on the legs with a telephone cord. She also related that after she had terminated her relationship with Appellant in late April 2001, he used force to get into Ms. Sands' car with Ms. Sands and her male companion, and threatened to stab the companion in the neck with a screwdriver Appellant had located in the car. Ms. Sands obtained domestic violence protective orders in Wetzel County against Appellant. The protective orders did not deter Appellant who went to Ms. Sands' place of work, Telespectrum,[2] in Wheeling, West Virginia on June 27, 2001, while a protective order was in effect. Ms. Sands said that Appellant lured her to join him outside by informing her that he had their baby and she should come out and say good bye to him. When she realized Appellant was lying, Ms. Sands said she called her grandmother who lived near her in Wetzel County and with whom she had a close relationship. The grandmother thereafter called the police and Appellant was arrested by two Wheeling police officers for violating the protective order then in force. According to Ms. Sands, Appellant employed a similar ruse to get her to leave work on July 23, 2001.

Ms. Sands testified that on July 23, 2001, she was at her work station at Telespectrum when one of her friends approached her to tell her that Appellant was outside. When she did not go outside to see him, Appellant came into her work area. Ms. Sands said Appellant tried to get her to leave work by telling her he had learned about a court hearing being conducted that morning at which Ms. Sands' mother was trying to obtain custody of the baby. As Ms. Sands was living with her mother at the time and her mother had not told her about such a hearing, Ms. Sands said saw no reason to believe Appellant. A supervisor who testified at trial said that when she asked Appellant to leave he willingly left without incident. According to Ms. Sands, as the supervisor was walking away, Appellant held up his shirt so that Ms. Sands could see he had a gun in the waistband of his pants, and at the same time Appellant informed her that if she did not come outside of the building at her next break then he would be returning to "cause a scene." Ms. Sands went outside on her next break around noon to find Appellant near the door with the gun still underneath his shirt. Ms. Sands maintains that she then walked away with Appellant because he said that if she did not he would kill her and then kill himself. When they arrived at a car which Ms. Sands knew belonged to Appellant's father, Ms. Sands said she tried to turn around and return to work because she knew the father would not knowingly allow Appellant to use the car because the son's driver's license had been suspended. In response to her attempts to leave, Ms. Sands contends that Appellant grabbed her, punched the back of her head and held the gun up to the area of her heart. The struggle resulted in Ms. Sands being forced onto the floor of the front passenger seat of the car.

Although Ms. Sands could not see where they were going, she said that Appellant drove around for a long period of time. It appears that Appellant drove to Ohio, but it is not entirely clear from Ms. Sands' testimony whether the first stop Appellant made in Ohio was at Barkcamp State Park (hereinaf-

---

**2.** Appellant also worked at Telespectrum but was placed on a different schedule from Ms. Sands'

when she obtained protective orders against him.

ter referred to as "Barkcamp") or a BP gas station located in the vicinity of the Interstate 70 exit ramp for Barkcamp.[3] While the record does not fix a time when the couple were at Barkcamp, a credit card receipt in the record established that the stop at the BP gas station was made approximately five hours after Ms. Sands went on her break at Telespectrum. Regardless of the sequence, significant events occurred at each stop.

Ms. Sands said that Appellant used her credit card at the BP gas station against her wishes. She further explained that she tried to get out of the car while Appellant was pumping gas, but he grabbed her by her clothes and pulled her back in the car, causing her shirt to stretch out of shape and the strap of her bra to break. The damage done to the clothing required Ms. Sands to put on a different shirt that was in the car.

According to Ms. Sands, Barkcamp is where she was raped by Appellant. Ms. Sands testified that when she got out of the car at Barkcamp Appellant pushed her towards the woods, forcing her to walk in the underbrush rather than on a nearby path. As related by Ms. Sands, Appellant told her he did not want her to walk on the path because he wanted her to "suffer like he had to suffer, because he used to hide in the woods whenever the police were looking for him" for violating a protective order she had obtained against him. Ms. Sands explained that they argued as they walked until they came up to a fallen tree, and then Appellant pushed her down over the tree where he raped her vaginally and anally. Ms. Sands was then forced by Appellant to walk through the underbrush on the return trip to the car.

Ms. Sands related that the next stop was at a Subway shop where Appellant purchased a sandwich.[4] According to Ms. Sands, she stayed in the car while Appellant went into the Subway, and she did not attempt to leave the car or run away. Thereafter, Appellant drove to Senecaville Lake,[5] where the couple fed bread from the sandwich purchased at Subway to the ducks. Ms. Sands said that when they left the lake she did not see where they were driving because Appellant made her keep her head down until the next stop at Wolf Run State Park (hereinafter referred to as "Wolf Run") near Caldwell, Ohio.[6] According to a Wolf Run ranger, Appellant parked his car at the far end of the parking lot near the ranger station and walked to the station to get information about the park facilities. Appellant then returned to the car and, as Ms. Sands explained, Appellant drove to Hannibal, Ohio, where they parked in a "wide spot" and stayed the night in the car.[7] On cross examination Ms. Sands stated that she and Appellant did not engage in sex during this stop.

The next day, July 24, 2001, Appellant drove to a Chevron gas station in Hannibal where Ms. Sands testified he again used her credit card without her permission. Ms. Sand's said that while Appellant was removing the credit card from her purse he found a picture of one of her male friends. Ms. Sands testified that this discovery caused Appellant to question her about the type of relationship she had with the man; during the questioning Ms. Sands said Appellant hit her repeatedly on the arm, leg and head. After completing the gas purchase, Appellant drove southward from Hannibal. He next stopped at a rest area where he allowed Ms. Sands to call her grandmother. Ms. Sands testified that during this phone call she asked, "how my Aunt Roxie was doing." and that this statement was a signal she had developed with the grandmother as a way to let the grandmother know Ms. Sands was in

---

3. Barkcamp is located in Ohio, roughly thirty miles west of Wheeling, West Virginia, off of Interstate 70.

4. The location of the Subway store is not revealed in the record.

5. We take judicial notice that Senecaville Lake is situated south of Cambridge, Ohio, off of Interstate 77.

6. Wolf Run State Park is located south of Senecaville Lake.

7. According to Ms. Sands' story, it appears that Appellant left the Interstate and took secondary roads to Hannibal, Ohio since Hannibal is located on Ohio Route 7, roughly fifty miles east of Interstate 77 and Wolf Run.

trouble and needed help.[8] Ms. Sands explained that she could not speak candidly with her grandmother during the phone call because Appellant never left her side; moreover, she was not sure where she was in order to have her grandmother send help. After the phone call, Ms. Sands said she asked to use the restroom in hopes of finding a way to escape from Appellant, but she found no alternative exits. The next stop was also a rest area at which Appellant called Ms. Sands' grandmother. Ms. Sands testified that Appellant asked the grandmother for the phone number of Ms. Sands' sister. Ms. Sands said Appellant wanted to call her sister to see if she knew how to contact the man Ms. Sands was seeing so that Appellant could beat him up. Ms. Sands further said that Appellant told her grandmother at this time that if he could not locate the male friend, then Ms. Sands would receive the beating for the male companion.[9] According to Ms. Sands, when they returned to the car Appellant did not immediately resume driving but instead looked in the car's glove compartment in which he found a knife. Ms. Sands said that Appellant cut the side of a bottle with the knife to demonstrate to her the sharpness of the blade. When Appellant arrived at Marietta, Ohio, Ms. Sands said he attempted to get a cash advance on Ms. Sands' credit card at an automatic teller machine. Ms. Sands testified that she told Appellant she could not remember the personal identification number (hereinafter referred to as "PIN") which was necessary to get the cash advance. According to Ms. Sands, as Appellant believed he could obtain the PIN number by calling the phone number on the back of the credit card, he drove to a pay phone which he saw at an Exxon service station to make the call. While Appellant was preoccupied on the phone, Ms. Sands ran inside the Exxon station. The gas station mechanic testified that Ms. Sands "came running in screaming, crying, and sweat running

off of her. And she ran behind me and . . . said someone had kidnapped her." The mechanic said that Appellant immediately thereafter came running in the door, saying by means of explanation that he and Ms. Sands had been fighting all night and he just wanted to take her home. According to the mechanic, Ms. Sands became more agitated and resumed screaming and crying and tried to keep the mechanic between her and Appellant. The mechanic further said that Appellant ran out of the station and drove off when he heard the mechanic announce that he was going to call the police. The mechanic followed through and called the Marietta police, and Appellant was apprehended a few blocks from the gas station.

Appellant explains events quite differently. Appellant maintains that while their relationship was somewhat strained, he and Ms. Sands had an on-going relationship and were seeing each other on a regular basis primarily because of their child. He essentially argues that Ms. Sands made up various portions of her story of what occurred on July 23 and 24, 2001, because she had discovered him in bed with another woman. According to Appellant, the events unfolded in the following way.

Appellant said that he and Ms. Sands had gone to a tavern in New Martinsville on July 22, 2001, where Appellant played pool and Ms. Sands spoke to mutual friends about marrying Appellant. According to Appellant, the couple had a celebration on the twenty-second day of each month to commemorate the anniversary of their meeting. Appellant further claims that Ms. Sands spent the night of July 22, 2001, with him at his father's house in New Martinsville where Appellant was residing. The next morning Appellant said Ms. Sands returned to her mother's home, from which Ms. Sands' grandmother picked Ms. Sands up and drove her to work in Wheeling.

---

8. The grandmother confirmed during her testimony at trial that such a signal or code had been developed between her and Ms. Sands.

9. During her testimony at trial, the grandmother said that she had received three calls from her granddaughter on July 24, 2001: two from unidentified locations and the third from a gas

station in Marietta. The grandmother said that she obtained the number where the calls originated by dialing "*" 69 and then relayed the phone numbers to the Wheeling Police Department. The grandmother's testimony about the substance of the first two phone calls generally corroborated Ms. Sands' narrative.

Appellant testified that he and Ms. Sands had made plans for Appellant to pick her up at work at Telespectrum on July 23, 2001, so that they could continue their anniversary celebration by going to lunch at Applebee's.[10] Appellant maintains that he arrived earlier than planned at Telespectrum because he wanted to talk with Ms. Sands about a conversation he overheard Ms. Sands' mother having after Ms. Sands had left for work about a court hearing sometime that morning regarding terminating Appellant's parental rights.[11] He said that he spoke with Ms. Sands about the court date, but left Telespectrum soon after Ms. Sands' supervisor requested him to do so. Appellant denied having a gun either inside or outside Telespectrum. He further explained that he was not aware until after he was stopped by the Marietta police that a BB gun was in the car.[12] Appellant also said if he had a gun in the waistband of his pants as Ms. Sands claimed, all of the workers outside on break from their jobs at Telespectrum would have seen the gun because he did not put on the shirt he was carrying with him that day until he entered Telespectrum.

After leaving Telespectrum, Appellant said that he walked around Wheeling until near noon at which time he returned to Telespectrum to meet Ms. Sands and take her to lunch. When he arrived outside Telespectrum, he visited with employees who were on their break until Ms. Sands appeared. Appellant said that Ms. Sands' testimony was incorrect in that he was not waiting outside of the door at Telespectrum and that in actuality he waved at Ms. Sands when she exited the building and motioned for her to join him. Appellant also contradicted Ms. Sands' testimony about him forcing her to immediately leave the area when she emerged from the building, contending instead that they sat and talked before going

to the car. A Telespectrum employee testified that she saw Appellant and Ms. Sands that day talking outside Telespectrum during the time it took the worker to make two trips to unload her car. This same witness also said that Appellant walked in front of Ms. Sands when they left the area; another eyewitness testified that Appellant crossed the street ahead of and separately from Ms. Sands.

Appellant said Ms. Sands voluntarily accompanied him to the car and they drove directly to Applebee's where he saw a police officer who had arrested him previously for violating a protective order. The policeman testified that he might have been to Applebee's that day and he did not recall ever seeing Appellant at the restaurant. Appellant related that after lunch he drove Ms. Sands to a Kaufmann's department store where she bought him a tee shirt and shorts, all of which Ms. Sands had previously testified had not occurred on the day in question. From Kaufmann's the couple drove to Barkcamp, where, according to Appellant's testimony, they changed into bathing suits and went swimming and sat at a picnic area where Ms. Sands carved "I love Michael" into a picnic table.[13] Appellant denied engaging in sex with Ms. Sands by any means while at Barkcamp that day. After leaving Barkcamp, Appellant said they stopped at a BP gas station nearby, and Ms. Sands' consented to placing the gasoline purchase on her credit card. Appellant denied that Ms. Sands tried to exit the car at the gas station or that he used force or ripped her clothing during that stop.

Appellant testified that the next stops made were at Senecaville Lake and then Wolf Run. At some point around this time, Appellant said the couple stopped at a Subway shop where Ms. Sands went in to buy a

---

10. Although not clear from the record, Appellant's brief fixes the location of the Applebee's at St. Clairsville, Ohio, which is within fifteen miles west of Wheeling by way of Interstate 70.

11. During her testimony, Ms. Sands' mother denied that such a conversation occurred; Ms. Sands also testified that her mother did not take such court action.

12. A BB gun was entered into evidence at trial through the testimony of a Marietta police office who said the gun bore a striking resemblance to a particular type of conventional handgun.

13. Swimwear was not among the various articles of clothing taken from the car and admitted into evidence; a picture of a picnic table with the referenced inscription was admitted into evidence.

sandwich while Appellant walked across the street to a gas station to buy a can of snuff. Appellant said when he discovered he underestimated the cost of the snuff, he turned to leave the store and get more money from the car. In the meantime, Ms. Sands had driven the car from the Subway to the gas station. After Appellant got the change he needed from inside the car and he bought the snuff, Appellant said that he got in the car and Ms. Sands drove to Senecaville Lake where they fed ducks and skipped stones before traveling on to Wolf Run. Appellant said that Ms. Sands drove up to the ranger station at Wolf Run where he went inside to find out what facilities were available at the park and then they left. While it is not clear who was driving or what route was taken, Appellant said that they arrived in Marietta, Ohio, where they stopped in a store to look at baby clothes. Appellant said that the stop was brief because it was near the time for the store to close. Since it was getting late and he wanted to go home, Appellant said that he began driving toward New Martinsville, remaining on the Ohio side of the river. Appellant explained that because he became distracted with Ms. Sands talking about marriage and he felt dazed from all of the driving, he missed the turnoff in Hannibal to the bridge which crosses the Ohio River to New Martinsville. When he realized his mistake, Appellant said he turned the car around and headed back toward Hannibal. Instead of going to New Martinsville, Appellant said that they spent the night at the "wide spot" near Hannibal. Appellant explained that the "wide spot" was a location where Ms. Sands and he would arrange to meet and talk when protective orders were in effect.[14] Contrary to Ms. Sands' testimony, Appellant said they had consensual sex in the car that night. When they awoke the next morning, Appellant said he informed Ms. Sands that he was going back to New Martinsville, but she said that she wanted to return to Marietta to shop for baby clothes. Appellant said that he finally agreed to go to Marietta and stopped in a gas station in Hannibal, again using Ms. Sands' credit card. En route to Marietta, Appellant said that Ms. Sands asked to call her grandmother so they stopped at a rest area to use a phone there. According to Appellant, while Ms. Sands was on the phone he went to the rest room and returned to the car to resume the trip to Marietta. At some point Ms. Sands informed Appellant that she wanted to call her sister who had just returned from Cleveland. Appellant said that they stopped at an Ashland gas station so that Ms. Sands could make the call, during which time Appellant went inside and purchased a soda. As related by Appellant, Ms. Sands drove from this gas station onward to Marietta. Before actually arriving in Marietta, Appellant said Ms. Sands asked him to call her credit card company to see how much credit was remaining on the card before they stopped to buy baby clothes. Ms. Sands then pulled into an Exxon gas station so that Appellant could make the call from a pay phone. When Appellant told Ms. Sands the balance on the card, Appellant said she insisted there had to be a mistake and asked Appellant to call back and verify the information. Appellant said that while he was redialing Ms. Sands exited the car and went into the gas station. Appellant followed Ms. Sands into the station where the mechanic asked him if there was a current protective order in effect involving the couple. When Appellant admitted there was an outstanding protective order, Appellant said the mechanic told him it would be best if Appellant would leave.

Appellant said he left the station and sat in the car for a few minutes before driving away. Shortly thereafter Appellant was pulled over by the police and arrested. Ms. Sands was taken to the hospital in Marietta where she received a full medical examination, during which a rape kit was completed.

Appellant was indicted in Ohio County in September 2001 on the charges of kidnapping,[15] first degree robbery,[16] two counts of

14. Appellant was under the incorrect assumption that a protective order was not effective across state lines and that he would not be arrested for violating the order if he was with Ms. Sands in Ohio.

15. *See* W.Va.Code § 61-2-14a (1999) (Repl.Vol. 2000).

16. *See* W.Va.Code § 61-2-12(a) (2000) (Repl.Vol. 2000).

sexual assault in the second degree,[17] abduction with the intent to defile,[18] violation of a protective order[19] and domestic battery.[20] A jury trial was held in the Ohio County Circuit Court, beginning on August 19 and concluding on August 22, 2002, resulting in Appellant's conviction for all charges in the indictment except abduction with intent to defile.[21] Following sentencing, Appellant filed a petition with this Court to appeal these convictions, which petition was granted.

## II. Standards of Review

Our common approach in reviewing challenges to criminal convictions is dependent upon whether the particular challenge involves determinations involving the law, the facts or a mixture of the two. Issues raised regarding questions of law are reviewed de novo. Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). Our review of the final order and ultimate disposition by the circuit court is based on an abuse of discretion standard and we review the underlying factual findings of the circuit court using a clearly erroneous standard. Syl. Pt. 1, *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995). "However, ostensible findings of fact, which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*."

**17.** *See* W.Va.Code § 61–8B–4(a)(1) (1991) (Repl. Vol.2000).

**18.** *See* W.Va.Code § 61–2–14 (1984) (Repl.Vol. 2000).

**19.** The indictment cited to West Virginia Code § 48–2A–10d, however, due to the legislative recodification of the chapter in 2001, the offense of violating a protective order is found at West Virginia Code § 48–27–903 (2001) (Repl.Vol. 2001). It is actually the latter statutory provision which was in effect at the time the protective order in this case was allegedly violated because the 2001 amendments took effect on April 14, 2001. The changes made in the law in 2001 did not substantively affect the established offenses or penalties.

**20.** *See* W.Va.Code § 61–2–28(a) (2001) (2003 Supp.).

**21.** Appellant was indicted for first degree robbery, but the jury returned a verdict of guilty of robbery in the second degree (W.Va.Code § 61–2–12(b)).

Syl. Pt. 1, in part, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996).

We pause briefly to note that there may be more specific standards of review for the diverse principles of law applicable to the numerous errors Appellant maintains were committed by the court below. In those instances where further standards are applicable, they will be incorporated within the discussion of the relevant issue.

## III. Discussion

### A. Venue/Jurisdiction

This case involves an examination of the fine but critical distinction between venue and jurisdiction, which is rather obscured by the proceedings below and which is made somewhat more difficult, as the lower court observed, because our law is not well defined as to the differences between and the treatment of the two concepts.

To be clear, the venue/jurisdiction concern only applies to the sexual assault and robbery convictions. The kidnapping, protective order violation and domestic battery convictions are in no way implicated in this discussion. Appellant's assertion in this regard is that the trial court committed error by not granting his motion for acquittal on the second degree sexual assault[22] and robbery[23]

**22.** West Virginia Code § 61–8B–4(a), defines a second-degree sexual assault offense as:

(a) A person is guilty of sexual assault in the second degree when:

(1) Such person engages in sexual intercourse or sexual intrusion with another person without the person's consent, and the lack of consent results from forcible compulsion; or

(2) Such person engages in sexual intercourse or sexual intrusion with another person who is physically helpless.

**23.** West Virginia Code § 61–2–12, addresses the offense of robbery as follows:

(a) Any person who commits or attempts to commit robbery by: (1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation or by striking or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than ten years.

(b) Any person who commits or attempts to commit robbery by placing the victim in fear of

charges because the prosecution failed to present evidence which established that the necessary elements of these offenses occurred in West Virginia. The state responds by asserting that venue to prosecute the sexual assault and robbery charges was proper in Ohio County, West Virginia, because the prosecution's evidence proved that some elements of the crimes were committed in Ohio County. The determination of whether the court in the case sub judiee had jurisdiction of the second degree sexual assault and robbery offenses for which Appellant was convicted presents a question of law which we previously said involves a de novo review.

1. Distinction between Venue and Jurisdiction

 The arguments of the parties and the law proffered in support of their respective positions refer interchangeably to venue or jurisdiction. Although at times related, these terms are hardly synonymous. In the context of a criminal case, jurisdiction involves the inherent power of a the court to decide a criminal case, whereas venue relates to the particular county or city in which a court with jurisdiction may hear and determine a case. Syl. Pt. 7, *Lester v. Rose,* 147 W.Va. 575, 130 S.E.2d 80 (1963), *overruled on other grounds by State ex rel. Sutton v. Spillers,* 181 W.Va. 376, 382 S.E.2d 570 (1989). "Thus, any court authorized by the [state] Constitution, or a statute enacted pursuant thereto, to hear and determine a case involving a criminal act has jurisdiction thereof." *Willis v. O'Brien,* 151 W.Va. 628, 630–31, 153 S.E.2d 178, 180 (1967). As long recognized by this Court, "[u]nder the Constitution and laws of this state, a crime can be prosecuted and punished only in the state

and county where the alleged offense was committed." Syl. Pt. 2, *State v. McAllister,* 65 W.Va. 97, 63 S.E. 758 (1909). *See also State ex rel. Haught v. Donnahoe,* 174 W.Va. 27, 32, 321 S.E.2d 677, 682 (1984) ("It is fundamental that both federal and state power is limited to its constitutional framework. The organic law embodied within each state constitution runs with the territorial jurisdiction of the state."); *Hotzel v. Simmons,* 258 Wis. 234, 45 N.W.2d 683 (1951) (without jurisdiction, criminal proceedings are a nullity).

 Appellant's basic contention is that West Virginia has no authority or power to prosecute or punish the offenses of robbery and sexual assault in this case because all of the elements of the offenses occurred, if at all, in the state of Ohio. This claim raises a territorial challenge to the jurisdiction of *any* court in West Virginia hearing and deciding the case rather than a venue-based objection regarding *which* West Virginia court in what particular locality within the state should handle the matter. Even if jurisdiction was not artfully defined as an issue on appeal, "[l]ack of jurisdiction may be raised for the first time in this court, when it appears on the face of the bill and proceedings, and it may be taken notice of by this court on its own motion." Syl. Pt. 3, *Charleston Apartments Corp. v. Appalachian Elec. Power Co.,* 118 W.Va. 694, 192 S.E. 294 (1937). *See also State v. McLane,* 128 W.Va. 774, 776, 38 S.E.2d 343, 344 (1946) (This Court may take congnizance of lack of jurisdiction when the question fairly arises on the record.). As revealed in later discussion, issues of jurisdiction appear readily from the record.

To support his claim that any trial against him for these offenses may only be had in Ohio, Appellant points to Rule 18 of the West Virginia Rules of Criminal Procedure [24] and

---

bodily injury by means other than those set forth in subsection (a) of this section or any person who commits or attempts to commit robbery by the use of any means designed to temporarily disable the victim, including, but not limited to, the use of a disabling chemical substance or an electronic shock device, is guilty of robbery in the second degree and, upon conviction thereof, shall be confined in a correctional facility for not less than five years nor more than eighteen years.
As this statutory provision does not fully define the offense of robbery, we adhere to the common

law definition of the crime: "The felonious taking of money or goods of value from the person of another or in his presence, against his will, by force or putting him in fear." *State v. Young,* 134 W.Va. 771, 779–80, 61 S.E.2d 734, 739 (1950) (citations omitted).

**24.** Rule 18 appears in the venue section of the West Virginia Rules of Criminal Procedure and states: "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a county in which the offense was committed."

cases which turn on or reference Article III, section 14 of the West Virginia Constitution. This portion of our state constitution in relevant part states: "Trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay, and in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county." *Id.*

The jurisdictional as well as venue implications of this constitutional provision were recognized early in the jurisprudence of this state in the case of *Ex parte McNeely*, 36 W.Va. 84, 14 S.E. 436 (1892). Under the facts of *McNeely*, a man from Logan County,[25] West Virginia was murdered in the river that forms the Kentucky/West Virginia border, with the shot being fired in Kentucky and the man actually dying in West Virginia where charges were brought. The murder conviction was appealed on the claim that the statute[26] upon which the conviction was based violated Article III, section 14 of the West Virginia Constitution. Speaking to the meaning of Article III, section 14, this Court in *McNeely* observed:

> It may be said with some plausibility that the constitutional provision applies only where both blow and death occur within the State, and only selects what county shall hold the trial; and that it does not apply where part of the offense is outside the State. But I regard it a question of jurisdiction arising under the constitution; and that nowhere in the State can trial be had except in that county where the offence is committed, and if not enough of

the act occurred in the county of death to enable us to say that the offence was committed there, then it has no jurisdiction, nor has any county of the State; for I construe the clause as meant to be co-extensive with all criminal acts justiciable under the power of the State.

36 W.Va. at 94, 14 S.E. at 439. Although expressing reservation with the statute's departure from common law principles fixing the sole location of trials in murder cases at the place where the fatal wound was inflicted,[27] the *McNeely* court upheld the constitutionality of the murder statute. In reaching the conclusion in *McNeely*, this Court recognized and deferred to the Legislature's authority to define the elements of a crime and then found that Article III, section 14 of the state constitution does not serve as a bar to this state enforcing such laws through its court system, even when some of the elements constituting the crime were committed in another state, as long as some significant element of the offense was committed within West Virginia. *Cf. State v. Lowe*, 21 W.Va. 782 (1883) (finding that a statute extending jurisdiction 100 yards beyond the county where any element of crime committed violated West Virginia Constitution Article III, § 14); *State v. McAllister*, 65 W.Va. 97, 63 S.E. 758 (1909) (setting aside conviction for robbery finding no element of common law robbery offense committed in West Virginia); *State v. Dignan*, 114 W.Va. 275, 278, 171 S.E. 527, 528 (1933) (observing that "[t]he crime itself or some act or element entering into it must actually have taken place in the county where venue is laid and the trial had. It is true that certain crimes[] may take place and

25. The offense occurred in what is now Mingo County, which was carved from Logan County in 1895.

26. The relevant part of the statute at issue in *McNeely* read:

> [i]f a person be stricken or poisoned out of this state, and die by reason thereof within this state, the offender shall be as guilty, and may be prosecuted and punished [in West Virginia], as if the mortal stroke had been given, or poison administered, in the county in which the person so stricken or poisoned may so die.

Although slightly modified, this statute now appears in the West Virginia Code at § 61–2–6.

27. As summarized by one authority, "[a]t common law (that is, in the absence of statute) jurisdiction over crimes is [generally] limited … by the notion that each crime has only one situs (or locus), and that only the place of the situs has jurisdiction. In other words, the common law picked out one particular act (or omission) or result of the act (or omission) as vital for the determination of the place of commission … of each of the various crimes … [as the means of ascribing] jurisdiction to that state (and only that state) where the vital act or result occurred." 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 2.9(a) at 180 (West 1986).

be committed in more than one locality, in which case venue may be laid in all or any one of such places.").

The question *McNeely* leaves for us to answer in the case before us is: What constitutes "how much of an act" which must occur in West Virginia for this state to have territorial jurisdiction, that is, to assert its sovereign authority to hear and decide a criminal charge under the state's penal laws? The lower court addressed this question, although using a somewhat different phraseology. As a preface to denying Appellant's motion for acquittal based on the territorial challenge which was raised at the close of the state's case in chief, the lower court said: "So the question is, as a practical matter, where is this case to be tried in a sense of fairness to everybody?" The lower court explained its reasoning for denying the motion as follows:

> [T]here is a certain, I think, logic to taking the initial act, which is grounded in force and threats and intimidation, and then follow that through and, insofar as the evidence most favorable to the State at this point, you have nothing more than acts that build upon that threat and force and intimidation; robbery in the first degree and sexual assault in the second degree.

> I could see an argument that conceivably could be made, that if you had an act outside the State of West Virginia that was charged, that has absolutely nothing to do with the force and threat or intimidation, that an argument could be made that venue would not be proper on that offense in Ohio County, West Virginia.

> But—even though we don't have—there's not a lot of good law in West Virginia to guide us, it just—I think fundamental fairness on both sides and common sense would require a finding, that when an offense begins in Ohio County, West Virginia that is related to an act of violence or force, anything that flows from that, no matter where it would be, the venue would be proper in West Virginia—Ohio County, West Virginia.

The state maintains that support for the lower court's conclusion is found in the United States Supreme Court case of *United States v. Rodriguez–Moreno*, 526 U.S. 275, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). The question in *Rodriguez–Moreno* actually turned on the provisions of a federal venue statute [28] and involved whether a district court in New Jersey had authority to convict a person for carrying a firearm while committing an act of violence in New Jersey when the firearm was used only in the state of Maryland. The Supreme Court examined the following language of the federal statute relied upon by the government to bring the charge in the New Jersey court:

> Whoever, during and in relation to any crime of violence ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years ...."

*Id.* at 279, 119 S.Ct. 1239 *quoting* 18 U.S.C. § 924(c)(1)). The violent predicate offense in *Rodriguez–Moreno* happened to be kidnapping. The high court found that closer examination of the nature of the predicate offense was essential in order to give meaning to the statutory phase "during and in relation to." Looking to the nature of kidnapping, the Supreme Court found that it was a continuing offense which does not end until the victim is free. The Supreme Court reasoned,

> Congress proscribed both the use of the firearm and the commission of acts that constitute a violent crime. It does not matter that respondent used the .357 magnum revolver, as the Government concedes, only in Maryland because he did so "during and in relation to" a kidnaping that was begun in Texas and continued in New York, New Jersey, and Maryland.

526 U.S. at 281, 119 S.Ct. 1239. In other words, the Supreme Court found that within the ambit of the federal statute in question the prosecution of the firearm offense could proceed in any location where prosecution for the continuing and violent offense of kidnapping might be brought.

Although the lower court concluded otherwise, the same bootstrap technique is clearly

**28.** 18 U.S.C. § 924(c)(1)(A).

not available in the present case to somehow tie the crimes of sexual assault in the second degree and robbery to the kidnapping offense in order to legitimize this state's assertion of jurisdiction. Nevertheless, we find the Supreme Court's examination of the nature of the offense as a continuing series of events somewhat relevant to our analysis and resolution of the jurisdictional issue.

2. Continuing Crimes

As we observed earlier in this opinion, under the general premise of the common law a crime is committed in just one place so only the government of that single place would have jurisdiction to prosecute and punish the crime. Exceptions were made at common law to this single situs rule for offenses characterized as "continuing" such as kidnapping and larceny. 4 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 16.1(d) (2d ed., West 1999). A continuing offense is a crime considered as transitory, on-going, or capable of repetition or continuation and as such is considered committed, and subject to prosecution, at any place where the crime was initiated, continued or completed. *Id.*

Several states [29] have found sexual assault in the second degree, commonly referred to as forcible rape, to be a continuing offense in circumstances such as the case before us. On a whole these courts have concluded that when the elements of an offense occur sequentially, are repeated or continue over a limited span of time or constitute a single chain of events, then the offense is a continuing crime by which venue lies both in the place where the defendant caused the victim to be fearful through use of force or threats of force and the place where the defendant engaged in the prohibited sexual act. *See Spoonmore v. State*, 411 N.E.2d 146 (Ind. App.1980) (single chain of events establishing a basis for jurisdiction where any act occurred); *State v. Redford*, 242 Kan. 658, 750 P.2d 1013 (1988) (series of events which are material elements forming single crime); *Moore v. Commonwealth*, 523 S.W.2d 635

(Ky.1975) (initial abduction a sequential part of carrying out the purpose of having carnal knowledge of victim); *People v. Slifco*, 162 Mich.App. 758, 413 N.W.2d 102 (1987) (crime began where force or coercion employed even though sexual penetration occurred in another location); *McKorkle v. State*, 305 So.2d 361 (Miss.1974) (threat of physical violence is an element of the offense which continued until the rape was committed; *State v. Gallup*, 520 S.W.2d 619 (Mo.App.1975) (rape continues until all elements of the crime are completed); *People v. Burgess*, 107 A.D.2d 703, 484 N.Y.S.2d 58 (1985) (force as an element of the crime continued uninterrupted through the rapes and until the victims were released). Additionally, at least one state has applied similar reasoning in finding robbery to be a continuing offense when elements of the crime are committed in more than one jurisdiction. *People v. Kalwa*, 306 Ill.App.3d 601, 239 Ill.Dec. 726, 714 N.E.2d 1023 (1999) (robbery takes on the nature of a continuing offense when the elements of the crime occur sequentially).

West Virginia Code § 61–11–12 (1969) (Repl.Vol.2000), which addresses where a crime committed in more than one county within the state may be tried, impliedly establishes a much broader category of continuing offenses than those identified as such at common law. This statute provides:

> When an offense is committed partly in one county and partly in one or more other counties within this State, it may be alleged that the offense was committed and the accused may be tried in any one county in which any substantial element of the offense occurred.

Although this multi-venue statute is limited by its terms to actions occurring within the state, we find its underlying theory compatible with resolving jurisdictional questions arising from situations where substantial elements of an offense are committed partly within West Virginia and partly within another state or states. A significant reason for reaching this conclusion is perhaps the most obvious: to provide no incentive for criminals

---

**29.** "A substantial majority of the states today have statutes that adopt an interpretation of the territorial principle substantially more expansive than the traditional common law position." 4 LaFave, *Criminal Procedure* § 16.4(c) at 579.

to elude prosecution and punishment for violating the penal laws of this state. As United States Supreme Court Justice Holmes stated in *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911), a case involving extradition:

> Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting ... [the accused] within its power.... [T]he criminal need not do within the State every act necessary to complete the crime. If he does there an overt act which is and is intended to be a material step toward accomplishing the crime, and then absents himself from the State and does the rest elsewhere, he becomes a fugitive from justice....

*Id.* at 285, 31 S.Ct. 558. Accordingly we hold that the offenses of sexual assault in the second degree and robbery may constitute continuing offenses for purposes of criminal prosecution within the territorial jurisdiction of the state of West Virginia. In order to be considered a continuing offense, the facts must demonstrate that at least one substantial or material element of the alleged sexual assault or robbery occurred within this state as part of a sequential chain of events. Therefore, on this basis we uphold the lower court's denial of the motion to acquit because at that stage in the proceedings the lower court was required to view the evidence in the light most favorable to the prosecution. Syl. Pt. 1, *State v. Fischer*, 158 W.Va. 72, 211 S.E.2d 666 (1974) (" 'Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.' *State v. West*, 153 W.Va. 325 [168 S.E.2d 716] (1969).").

3. Role of Jury

■ When subsequently submitted to the jury, the lower court's relevant instruction treated the matter as one of venue, adhering to the standards set forth in syllabus point five of *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979) ("The State in a criminal case may prove the venue of the crime by a preponderance of the evidence, and is not required to prove the same beyond a reasonable doubt."). The court's instruction stated:

> You are instructed that venue is a jurisdictional element of proof in a criminal trial. The State is permitted to prove venue by circumstantial evidence. The State need only prove venue by a preponderance of the evidence and is not required to prove venue beyond a reasonable doubt.

> A trial may be held and venue may be established in any jurisdiction in which a substantial element of the offense occurred.

Since we have defined the issue as territorial jurisdiction rather than venue, in order to determine the adequacy of the lower court's instruction we now must consider whether the judge or jury should ultimately resolve the question of territorial jurisdiction and by what measure of proof.

■ Jurisdiction is generally a question of law for the court to decide. However, our earlier finding in this opinion—that a challenge raised to territorial jurisdiction under these circumstances requires a finding that at least one substantial element of the crime has been committed in West Virginia—presents a question of fact which is traditionally left to the jury to decide. Syl. Pt. 2, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967) ("The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses."). We see no reason to depart from this practice when conflicting evidence is presented regarding where an element of the crime is committed so as to determine whether the state has the power to bring the criminal proceeding. When faced with this same question, the Supreme Court of Arizona concluded that territorial jurisdiction is a decision left for the jury when the "facts are intertwined with the merits of the case [making] the jurisdictional and substantive issues ... difficult to resolve

separately." *State v. Willoughby,* 181 Ariz. 530, 892 P.2d 1319, 1325 (1995). A goodly number of state courts have likewise held that resolution of disputed jurisdictional facts is a matter within the province of the jury. *See e.g. State v. Cullen,* 695 P.2d 750, 751 (Colo.App.1984); *Sheeran v. State,* 526 A.2d 886, 890 (Del.1987); *Johnson v. State,* 465 So.2d 499, 504 (Fla.1985); *Conrad v. State,* 262 Ind. 446, 317 N.E.2d 789, 792 (1974); *State v. Liggins,* 524 N.W.2d 181, 184 (Iowa 1994); *State v. Baldwin,* 305 A.2d 555 (Me. 1973); *State v. Darroch,* 305 N.C. 196, 287 S.E.2d 856, 866 (1982); *People v. McLaughlin,* 80 N.Y.2d 466, 591 N.Y.S.2d 966, 606 N.E.2d 1357, 1359–60 (1992); *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255, 258 (1973). Significantly few states view the adequacy of proof under these circumstances as an issue which the court solely resolves. *See State v. Beverly,* 224 Conn. 372, 618 A.2d 1335, 1339 (1993) (collecting four cases). Consequently, the lower court properly submitted the issue to the jury. Nevertheless, we are not convinced that territorial jurisdiction, which involves determining where an element of the crime occurred, should be decided by a mere preponderance of the evidence.

A considerable number of states require jurisdictional facts must be proven beyond a reasonable doubt.[30] The predominant reasons for that conclusion has been summarized by one recognized authority in the following way:

> Use of the beyond a reasonable doubt standard [in resolving disputed jurisdictional facts] minimizes the possibility that a defendant will be tried in one state for a crime actually committed elsewhere. Moreover, it makes it more likely that other states will afford full faith and credit to decisions regarding criminal jurisdiction, even though they are not constitutionally required to do so. There is also the practical consideration that using a lesser standard for a portion of the prosecution's case and the beyond a reasonable doubt standard for the rest would doubtless create confusion in the minds of the jurors.

1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* § 2.7(b) at 163 (West 1986) (footnotes omitted). The profound intertwining of the jurisdictional facts with the merits of the case in these instances leads us to conclude that proof of the existence of territorial jurisdiction is the same as that required to prove the elements of the crime—proof beyond a reasonable doubt. Syl. Pt. 4, *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210 (1976), *overruled on other grounds by Jones v. Warden, West Virginia Penitentiary,* 161 W.Va. 168, 241 S.E.2d 914 (1978) ("In a criminal prosecution, the State is required to prove beyond a reasonable doubt every material element of the crime with which the defendant is charged. . . .").

■ In consideration of the foregoing we conclude that the judge and jury share responsibility for the ultimate determination of territorial jurisdiction in a criminal case involving controverted jurisdictional facts. The court must first determine as a matter of law whether the elemental act or consequence at the heart of the disputed evidence would be sufficient to establish jurisdiction if it occurred within the state. If sufficiency is

---

**30.** *See Mayhall v. State,* 22 Ala.App. 223, 114 So. 361 (1927); *State v. Willoughby, supra* (Ariz. 1995); *DeWitt v. State,* 306 Ark. 559, 815 S.W.2d 942 (1991); *Sheeran v. State, supra* (Del.1987); *Mitchell v. United States,* 569 A.2d 177 (D.C.App. 1990); *Lane v. State,* 388 So.2d 1022 (Fla.1980); *State v. Thomas,* 8 Haw.App. 497, 810 P.2d 668 (1991); *People v. Holt,* 91 Ill.2d 480, 64 Ill.Dec. 550, 440 N.E.2d 102 (1982); *McKinney v. State,* 553 N.E.2d 860 (Ind.App.1990); *State v. Liggins, supra* (Iowa 1994); *State v. Baldwin, supra* (Me. 1973); *West v. State,* 369 Md. 150, 797 A.2d 1278 (2002); *Presley v. State,* 217 Miss. 112, 63 So.2d 551 (1953); N.H.Rev.Stat. Annot. ch.625:4; *State v. Schumann,* 111 N.J. 470, 545 A.2d 168 (1988); *State v. Ramirez,* 89 N.M. 635, 556 P.2d 43 (1976); *People v. McLaughlin, supra* (N.Y.1992);

*State v. Batdorf,* 293 N.C. 486, 238 S.E.2d 497 (1977); *State v. Rose,* 311 Or. 274, 810 P.2d 839 (1991); *State v. Shatney,* 572 A.2d 872 (R.I. 1990); *State v. Greene,* 86 S.D. 177, 192 N.W.2d 712 (1971); *State v. Beall,* 729 S.W.2d 270 (Tenn. Crim.App.1986); *State v. Svenson,* 104 Wash.2d 533, 707 P.2d 120 (1985). *See also* Annotation, *Necessity of Proving Venue or Territorial Jurisdiction of Criminal Offense Beyond Reasonable Doubt,* 67 A.L.R.3d 988 (1975–2004); ALI Model Penal Code §§ 1.12, 1.13[9][e]. By stark contrast, only California and Utah allow territorial jurisdiction to be proven by a preponderance of the evidence. *People v. Cavanaugh,* 44 Cal.2d 252, 282 P.2d 53 (1955); Utah Code Annot. § 76–1–501(3).

found by the court, the matter is submitted to the jury for determination of whether the evidence demonstrates beyond a reasonable doubt that the act or consequence at issue actually occurred within the borders of the state.[31] Because territorial jurisdiction determines the power of the state to proceed in prosecution of its penal laws and its absence renders a verdict void,[32] the jury should be instructed that if the state has not carried its burden on the disputed jurisdictional evidence then a verdict of not guilty should be returned.

■ The state argues that the evidence in this case conclusively proved that West Virginia had territorial jurisdiction of the offenses of sexual assault and robbery and the convictions should be upheld. The state specifically contends that forcible compulsion, as a material element of sexual assault, and the threat of deadly force,[33] as a material element of robbery, occurred in West Virginia when the gun was displayed to the victim and she was kidnapped. We fail to find from our review of the evidence that only one possible conclusion can be reached.

While the evidence does establish that Ms. Sands was kidnapped from West Virginia and transported to Ohio, it is not clear that the abduction occurred as a result of "force" or "threat" rather than "fraud or enticement." W.Va.Code § 61–2–14(a). For example, evidence that the historic relationship of the parties included violence and that a BB gun resembling a conventional handgun was found in the car could lead a jury to conclude that force was used to abduct Ms. Sands. However, the evidence that previous lunch plans had been made and that Appellant wanted to talk with Ms. Sands about court action being taken regarding the couple's child might have been viewed by the

jury as a means by which Ms. Sands was enticed to leave the state with Appellant. A jury could also have found that tensions escalated and the fear necessary to return guilty verdicts for the rape and robbery crimes developed in Ohio during the five hours the couple were driving after the abduction from West Virginia and the first stop in Ohio. Based upon our holding regarding disputed evidence, resolution of whether the element of fear or other essential element of second degree sexual assault or second degree robbery occurred in West Virginia was for the jury to decide beyond a reasonable doubt. The lower court failed to take into account the dispute in the evidence and thus committed an error of law by not instructing the jury of its responsibility to determine, beyond a reasonable doubt, whether any element of the crimes of sexual assault and robbery occurred in West Virginia so as to establish territorial jurisdiction. Accordingly, the sexual assault and robbery convictions must be set aside.

## B. Removal of Juror

■ Appellant next assigns error to the lower court's refusal to grant a mistrial when it was learned during the course of the trial that one of the jurors was the daughter of a woman who had been a secretary in the prosecutor's office and was working in the circuit clerk's office at the time of trial.

■ In *West Virginia Human Rights Commission v. Tenpin Lounge*, 158 W.Va. 349, 211 S.E.2d 349 (1975), we addressed how such situations are properly examined:

Just as the trial court has discretion over *voir dire* examination, so should it have discretion on the question of whether a new trial should be granted because of

---

31. To be clear, our holding does not establish jurisdiction as a substantive element of the crime which the state must prove in every case. In most cases, the power of the state to enforce its penal laws is not at issue and territorial jurisdiction is presumed.

32. See Syl. Pt. 5, *State ex rel. Hammond v. Worrell*, 144 W.Va. 83, 106 S.E.2d 521 (1958), *overruled on other grounds by Patterson v. Patterson*, 167 W.Va. 1, 277 S.E.2d 709 (1981) ("A decree entered in a pending suit in which the court

lacks jurisdiction of the subject-matter is to that extent void ...."); 20 Am.Jur.2d Courts § 57 (1995) ("[W]hen a court lacks jurisdiction its decision, right or wrong, is void ....").

33. As the jury returned a verdict of guilty of the lesser offense of second degree robbery rather than the charged first degree robbery, it appears that they concluded that the threat of deadly force was not present. W.Va.Code § 61–2–12, *supra* n. 23.

false answers given by a prospective juror on such examination. In the exercise of its discretion in the latter instance a trial court should, when requested, permit interrogation of the prospective juror to determine the truth or falsity of such answers and the relevancy thereof to the case under consideration.

*Id.* at 358, 211 S.E.2d at 354–55. The state also points us to *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), in which the United State Supreme Court set forth a particularized test for determining whether a new trial is required when there is juror deceit during voir dire. This test requires the proponent of the new trial to:

first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 556, 104 S.Ct. 845.

In the present case, the trial court expressed great concern with the discovery and proceeded to conduct the necessary hearing sua sponte. The hearing did not reveal any intent on the part of the juror to withhold information regarding her mother's employment; the record demonstrates that the juror simply misunderstood the voir dire question. Appellant's counsel did not question the juror during the hearing and did not demonstrate how a correct response by the juror would have provided a valid basis to sustain a challenge for cause or show that the juror was actually biased. In essence, there was no showing of prejudice or other basis for the lower court to find that injustice would result from the juror's continued participation on the panel. We find the trial court properly employed its discretion by refusing to grant a mistrial.

**C. Exclusion of Expert Witness on Battered Woman's Syndrome**

 Appellant asserts that the trial court's failure to allow introduction of expert testimony to rebut the state's evidence about BWS is reversible error warranting that the verdict be set aside and a new trial granted. The hurdle Appellant must overcome to establish such error is fairly high as "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless clearly wrong." Syl. Pt. 6, *Helmick v. Potomac Edison Co.,* 185 W.Va. 269, 406 S.E.2d 700 (1991).

The trial court made pre-trial rulings about the use of BWS experts, concluding that unless the state offered evidence regarding BWS then no expert testimony about the issue would be permitted. The state reserved the right to call such an expert, but elected not to do so during trial. Appellant's claim is that even though the state did not call the expert at trial, the state elicited testimony which used terms and concepts commonly associated with BWS which should have served to "open the door" for Appellant's expert to testify. The record shows that no testimony or other evidence was introduced during the trial which established a connection between the questioned terms or concepts and BWS, so we fail to see how the testimony was relevant and would serve to "assist the trier of fact to understand the evidence." W.Va. R. of Evid. 702. *See Gilman v. Choi,* 185 W.Va. 177, 406 S.E.2d 200 (1990) (Rule 702 of the West Virginia Rules of Evidence is concerned primarily with the relevancy of expert testimony). The trial court wisely exercised discretion by excluding such testimony, which more likely would have confused rather than enlightened the jury.

**D. Repetition of Victim's Statements as Impermissible Hearsay**

 Next Appellant maintains that the trial court incorrectly allowed the state's witnesses to repeat the victim's statement resulting in bias and prejudice. Our standard of review regarding a circuit court's decision to admit or exclude evidence was summarized in *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), in the following way: "[M]ost rulings of a trial court regard-

ing the admission of evidence are reviewed under an abuse of discretion standard .... [A]n appellate court reviews *de novo* the legal analysis underlying a trial court's decision." *Id.* at 680, 461 S.E.2d at 186.

■ As to the hearsay concerns Appellant raises, we held in syllabus point one of *State v. Maynard,* 183 W.Va. 1, 393 S.E.2d 221 (1990):

Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules.

■ Before applying these standards, we initially observe that Appellant's claim involves the testimony of seven of the state's witnesses. We further note that Appellant failed to object when three of the witnesses testified. Errors assigned for the first time on appeal will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court had objection been raised there. Syl. Pt. 17, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974). The questioned testimony of one of the law enforcement witnesses did not involve the statement of the victim but rather that of the victim's grandmother when she called the Wheeling Police Department to report the kidnapping. As the officer simply testified to what he heard during that conversation and what he did as a result of what he heard, we find no hearsay let alone error. The record also shows that the trial court allowed the victim's statement to be read into the record by the detective who took the statement but only after Appellant during cross-examination had the detective read from the statement. Whether or not

testimony involves impermissible hearsay, a party "will not be permitted to complain of error in the admission of evidence which he offered or elicited[.]" Syl. pt. 2, in part, *State v. Bowman,* 155 W.Va. 562, 184 S.E.2d 314 (1971). As a result, the hearsay challenge boils down to two state witnesses: the gas station mechanic in Marietta, Ohio, who called the police, and one detective with the Wheeling Police Department.

■ The lower court allowed the admission of the hearsay testimony of the gas station mechanic under the excited utterance exception to the rule against the admission of hearsay,[34] and allowed the testimony of the Wheeling detective to be admitted because the victim's out-of-court statement was not offered for the truth of the matter asserted, but rather to explain the actions taken by the officer after the statement was made to him. We find no abuse of discretion as to admission of this evidence. The gas station mechanic's testimony, prior to relating any hearsay statements, described the victim when she entered the gas station as "hysterical, screaming. She was crying. Sweat was running off her where you could just tell she was upset, and she just—like I said, hysterical." This was a sufficient foundation from which the trial court could conclude that the out-of-court statement of the victim which the mechanic thereafter related was an excited utterance. As to the officer's testimony, the victim's statements involving her rape helped explain why the detective went to Barkcamp and collected evidence there. Moreover, the record shows that the jury was instructed as to the limited purpose of the recitation of the out-of-court statements.

### E. Evidence of Other Crimes, Wrongs or Acts

■ The trial court's decision to allow evidence involving "prior bad acts" of Appellant is also challenged in this appeal. W.Va. Rules of Evidence 404(b).[35] Appellant claims

---

**34.** *See* W.Va. R. Evid. 803(2).

**35.** Rule 404(b) of the West Virginia Rules of Evidence (1994) states:

*Other crimes, wrongs or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided

particularly that testimony received at trial about events allegedly occurring in April, May and June of 2001 was not relevant to the charges before the jury regarding acts committed in July 2001, thus making the testimony more prejudicial than probative. The state counters this argument by asserting that the trial court properly determined that the questioned evidence was res gestae, making its admission proper.

 The trial court characterized the challenged evidence "[a]s part of the fabric of the underlying charge," outside the customary Rule 404(b) procedure and analysis, making it unnecessary to conduct an in camera hearing as set forth in *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994). The trial court's actual ruling is as follows:

> THE COURT: I'm going to hold that we do not need a *McGinnis* hearing, and all those [incidents] are admissible [36].... because they basically are all part of the overall relationship between this gentleman and the defendant (sic).

Our first consideration thus becomes whether the trial court properly determined that the evidence was res gestae. "Events, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae* and admissible at trial." Syl. Pt. 3, *State v. Ferguson*, 165 W.Va. 529, 270 S.E.2d 166 (1980), *overruled on other grounds by State v. Kopa* 173 W.Va. 43, 311 S.E.2d 412 (1983). However, "[o]ther criminal act evidence admissible as part of the res gestae or same transaction introduced for the purpose of explaining the crime charged must be confined to that which is reasonably necessary to accomplish such purpose." Syl. Pt. 1, *State v. Spicer*, 162 W.Va. 127, 245 S.E.2d 922 (1978). Additionally, we concluded in *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), "that historical evidence of uncharged prior acts which is inextricably intertwined with the charged crime is admissible over a Rule 403 objection." 196 W.Va. at 313, 470 S.E.2d at 632. In support of this conclusion we observed:

> In determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." *See United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990): " 'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." (Citations omitted). If the proffer fits in to the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof charged in the indictment. *See United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980) (stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is ... appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the "res gestae" ' "). (Citations omitted).... [E]vidence admissible for one of the purposes specified in Rule 404(b) and *res gestae* not always is separated by a bright line. *See United States v. Cook*, 745

that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**36.** At a status conference held on February 7, 2002, the state enumerated the following prior acts which it intended to introduce into evidence at trial to establish a history of abusive, harassing and controlling conduct by the accused toward the victim: on January 16, 2000, the accused struck the victim in the stomach, grabbed her arm and head while verbally threatening and abusing her; the accused held his hand over the victim's mouth and nose on April 28, 2001; on April 29, 2001, the accused struck the victim with a telephone cord and held her down on a bed and struck her legs; on May 17, 2001, the defendant stopped the victim's motor vehicle, obtained her keys and then drove her around in the vehicle for two hours without permitting her to leave; existence of protective orders from Wetzel County with evidence of violation of an order in effect on June 27, 2001 when accused approached the victim while on a break from work in Wheeling. Only the April, May and June occurrences were introduced at trial through the testimony of the victim and a law enforcement officer.

F.2d 1311, 1317–18 (10th Cir.1984), *cert. denied*, 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985).

*LaRock*, 196 W.Va. at 312 n. 29, 470 S.E.2d at 631 n. 29.

The evidence contested by Appellant is the testimony of the victim, the victim's grandmother and two Wheeling law enforcement officers. The victim's testimony related various incidents occurring in the three months preceding the events occurring on July 23 and 24, 2001, for which Appellant was indicted. These incidents were used to demonstrate Appellant's pattern of abusive and controlling behavior as a means of defining the turbulent nature of the relationship the victim had with Appellant after she attempted to break off the relationship with Appellant in late April 2001. The testimony of the grandmother and law enforcement officers related the events of June 27, 2001, which bore a striking similarity to the July episode and resulted in the arrest of Appellant for violation of a domestic violence protective order. After carefully reviewing the record, we cannot say that the trial court abused its discretion in finding that the prior acts constituted intrinsic evidence, not subject to Rule 404(b) analysis. While the acts were not part of a "single criminal episode" or "necessary preliminaries" to the charged offenses, it is difficult to conclude that the evidence was not necessary "to complete the story of the crimes on trial" or otherwise provide context to the crimes charged. *Id.* This is especially true in light of the domestic violence overlay to the pattern of behavior. Even if we were to conclude that the trial court erred in finding the prior act evidence to be res gestae, we believe the evidence would still be admissible under Rule 404(b).

The incidents from Appellant's recent past would have satisfied a number of acceptable purposes set forth in Rule 404(b), including proving motive, opportunity and knowledge. In either case, it seems doubtful that this case could have been appropriately presented without such background information. Finding that the lower court did not act in an arbitrary or irrational manner or otherwise abuse its discretion, we find no error.

Our review of the remaining errors—allowing a nurse to testify as an expert regarding the victim's injuries, providing no remedy for an inadequate police investigation, and failing to instruct the jury to disregard prejudicial statements of the prosecutor during closing argument—results in our finding all to be without merit.[37]

## IV. Conclusion

In sum, we affirm the judgment of conviction for all crimes except sexual assault and robbery and we remand for a new trial on these latter charges. If state territorial jurisdiction is placed into issue and conflicting facts are again presented during the new trial, the jury should be instructed that jurisdiction to hear and decide the case rests on the existence of evidence beyond a reasonable doubt that an essential element of the particular crime was committed within the state of West Virginia; therefore, a verdict of guilty can only be returned if the jury finds that some element of each of the herein determined continuing offenses occurred in West Virginia. Accordingly, the August 22, 2002, order of the Circuit Court of Ohio County is reversed in part and affirmed in part, and remanded for further proceedings.

---

**37.** As to the nurse witness, Appellant failed to preserve this objection at trial and he adopted the witness as his own expert. "[E]rrors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to there." Syl. Pt. 17, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). Any problem that Appellant had with the police investigation also was not meaningfully raised before the trial court so that a proper examination could be undertaken either in the court below or here. *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995). The final error alleged involved remarks made during the closing argument by the prosecutor. The record shows that the remarks Appellant raises in his brief were not objected to at trial. Appellant's singular timely-raised objection was sustained and that ruling was followed by a curative instruction to the jury. Our review of the record shows that Appellant did raise two further objections to remarks made by the prosecutor, both of which did "not clearly prejudice the accused or result in manifest injustice" so as to warrant reversal of the convictions. Syl. Pt. 5, *State v. Ocheltree*, 170 W.Va. 68, 289 S.E.2d 742 (1982).

Affirmed in part, reversed in part an remanded.