# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No.  17-0101** (Berkeley County 07-F-58)

**Stephen R. Fielder,**
**Defendant Below, Petitioner**

**FILED**

**May 11, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Stephen R. Fielder, by counsel B. Craig Manford, appeals his conviction in the Circuit Court of Berkeley County for murder in the first degree. Respondent State of West Virginia, by counsel Robert L. Hogan, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On August 20, 2006, two red American Tourister suitcases were found partially submerged in Back Creek in Berkeley County. The larger of the two suitcases was riddled with puncture holes and contained a dismembered human torso. The smaller suitcase contained a human head and arms, along with two "Gold's Gym" free weights. Three weeks later, a third American Tourister suitcase was discovered in Back Creek; it also contained free weights, as well as human legs and feet. The police photographed the suitcases and their contents. An autopsy conducted by the State Medical Examiner's office revealed that all of the body parts belonged to the same person. The police traced the American Tourister luggage to Walmart, which exclusively sold that particular type of luggage. Walmart also sold the Gold's Gym free weights found in two of the suitcases. The police's search of receipts from Walmart revealed only one recent purchase of both the American Tourister luggage and the Gold's Gym free weights; that purchase was made on August 14, 2006. The police obtained the video footage of the purchase and recognized the purchaser as petitioner, a local attorney.

The police learned that petitioner had three ex-wives. They located the first and third ex-wives, but could not locate the second ex-wife, Debra Fielder. Petitioner married Debra Fielder ("Ms. Fielder") in 1993, but the couple divorced in 2002. Following the divorce, Ms. Fielder led a transient lifestyle, but would turn up at petitioner's home from time to time. The police obtained dental records for Ms. Fielder that were a match for the teeth in the severed head.

On September 7, 2006, the police questioned petitioner about Ms. Fielder; petitioner told police that she had been at his home that summer, but had left and gone to North Carolina. The

1

police covertly recorded the interview. Immediately thereafter, the police executed a search warrant on petitioner's home. There, they found a small amount of blood splatter in the basement that was later identified as belonging to Ms. Fielder. The police also found petitioner's pet prairie dog in a cage. Thereafter, petitioner was indicted for the first-degree murder of Ms. Fielder (hereinafter, the "victim"). It was later determined that the victim died sometime on or around August 11, 2006.

Pretrial, petitioner challenged the admission of the photographs of the suitcases and their contents, and those taken during autopsy on the ground that they were "gruesome." Petitioner offered to stipulate at trial that the remains were those of the victim. Further, petitioner's counsel pledged he would not cross-examine the State's witnesses on the identification of the remains. The State countered that it was entitled to show how the victim's body parts were discovered and how they appeared at that time. The circuit court found that the State intended to use the photographs for purposes of identification and for the manner of death and, therefore, denied petitioner's motion in limine. The circuit court also found that "gruesomeness is not what it used to be. Public people are just more inured to things, movies and otherwise, more cynical and more or less shocked." Finally, the State agreed not to elicit the fact that petitioner had practiced law for a three-year period without a law license. Specifically, the State agreed that the "door would not be opened" absent a diminished capacity defense.[1]

At petitioner's trial, the State called nineteen witnesses, including the following:

Dr. Nabila Haikal, the First Deputy Chief Medical Examiner at the West Virginia Office of the Chief Medical Examiner, testified that, to a reasonable degree of scientific certainty, the cause of the victim's death was from assaultive injuries, including sharp and blunt force trauma; and the manner of death was homicide. During the victim's autopsy, Dr. Haikal found stab wounds, cuts, and incised wounds, as well as signs of blunt force trauma, including bruising on the victim's forehead and thighs, and multiple broken ribs. Dr. Haikal noted that the anterior of the victim's neck was missing and, therefore, she was unable to determine if the victim had been strangled. Dr. Haikal admitted she had difficulty determining which of the stab wounds in the victim's torso were inflicted pre-mortem and which were inflicted post-mortem when petitioner stabbed the suitcase that contained the torso in an apparent effort to get the suitcase to sink. Dr. Haikal testified that pre-mortem stab wounds are identified by the presence of blood in tissues along the track of the wound; however, when a body is immersed in water for a significant period, as occurred here, blood may leach out making it difficult to make a definitive determination as to whether a wound was inflicted pre- or post-mortem. Dr. Haikal emphasized that many of the stab wounds appeared to have been made post-mortem, but at least two stab wounds were made "very clearly before death," and several others were probably pre-mortem. Dr. Haikal stated that one of two clearly pre-mortem stab wounds went into the victim's lung; the other went into her abdomen. The first of these two pre-mortem stab wounds was five and a half inches deep and on the front of the torso; the second was seven inches deep and on the back

---

[1] The West Virginia State Bar suspended petitioner's West Virginia law license in 2003 for failure to comply with mandatory continuing legal education reporting; petitioner's Maryland law license became inactive in 2001.

of the torso. Dr. Haikal further testified that it would have been difficult to match the wounds in the victim's torso to the puncture holes on the suitcase that contained the torso, but her recollection was that there were fewer stab holes in the suitcase than there were stab wounds on the victim's torso. Finally, Dr. Haikal testified that an animal likely caused the postmortem injury found on the victim's left ear.

On cross-examination, Dr. Haikal admitted that some of the bruising on the victim's body could be consistent with accidental injury, and that she did not list the number of stab wounds in the suitcase in her report. Petitioner's counsel then asked, "Is it still your opinion to a reasonable degree of medical certainty that [one of the wounds] was pre-mortem?" Dr. Haikal replied "more likely pre-mortem than post-mortem."

John Carson, D.D.S., West Virginia's Chief Dental Examiner, testified that he identified the victim through her dental records. He also testified that an injury found on the victim's left ear was, more likely than not, caused by petitioner's prairie dog.[2]

Petitioner's first ex-wife testified that her marriage with petitioner as "fairly rocky -- pretty rough times." She claimed that, circa 1974, petitioner slapped her and knocked her to the ground and that he attempted to punch her. She also said that petitioner grabbed her hand or arm and squeezed it very hard, leaving a bruise. Petitioner's third ex-wife testified that she was married to petitioner from 2003 to 2006 and that petitioner was never threatening or violent towards her. She also testified that petitioner suffered two strokes in 2003, which left him with physical limitations and problems with mental processing.

Linda Johnson testified that she met petitioner in 1999 and assisted him with various business affairs. She also testified that petitioner wrote her a letter in January of 2007, following his incarceration on the first-degree murder charge. In petitioner's letter, which the State entered into evidence at trial, he admitted to striking the victim and that she "was killed in the act of stealing from [petitioner]," as follows:

> [The victim] and at least [her boyfriend] but others too decided to put me out of the house with a temporary family protective order, and then in the week to ten days it would take to have a hearing for me to get back into the house, clean me out and take everything of value.
>
> [The victim's] goal was to provoke an argument and then have [her boyfriend] and others perhaps put me out of the house while police were called and evidence of abuse staged. Meth affects your judgment and gives you a continuing sense of power and control or so I am told.
> I do not think that [the victim] thought for an instant that I would resist in anyway, certainly she never imagined that I would actually strike her. In all of the

---

[2] At a pretrial hearing, petitioner objected to the evidence that petitioner's prairie dog likely inflicted an injury on the victim's ear postmortem. The State argued that it needed the evidence to show that the victim's corpse had been in petitioner's home. The circuit court overruled petitioner's objection.

troubles we had over the years I had always restrained myself and avoided any type of violence.

[The victim] was killed in the act of stealing from me and people who were trusting in me. The result was perhaps harsher than it might have been if I had time to reflect upon it, or if I had control of my emotions, or if I had been unimpaired by my strokes. But the reality of things is that I was being robbed and I defended myself.

Petitioner called five witnesses during his case-in-chief, including the following:

Two character witnesses claimed they had never known petitioner to be violent. One of the character witnesses testified that she last saw the victim in July of 2006 and that she had the impression the victim was doing heavy drugs.

Petitioner testified as follows: The victim was his second ex-wife. They met and married in 1993. During the couple's marriage, the victim worked in his law office and learned about domestic violence petitions. They divorced in 2002 when petitioner learned the victim had spent all of the family's money and his law office's escrow account, allegedly to support her drinking and gambling habits. The couple had periodic contact following their divorce and, occasionally, petitioner would let the victim stay with him or give her money. He had two strokes in 2003 that limited his law practice to eight to ten simple bankruptcy petitions a month. The victim did not have her own residence and occasionally listed petitioner's address as her own. On the day of her death, the victim had been staying with petitioner, but he told her she had to leave that day. The victim's death was an accident; she fell as she tried to lock petitioner out of his house. Specifically, as he attempted to block the victim from locking him out, he accidentally struck her on her shoulder and head with his partially disabled arm. As a result, the victim lost her balance and fell down several basement stairs. She landed head first on a concrete pad and died soon after. He was in shock when the victim died and thought no one would believe it was an accident. He did not call the police because he believed that if the police arrested him, his bankruptcy clients would be out in the cold with no one to represent them. He resolved not to do that to his clients. Because he was physically unable to move the victim's body, he pulled it down the remaining basement stairs and dismembered it. He intended to bury the body parts at Sleepy Creek State Park, but had car trouble. Therefore, he placed the suitcases in Back Creek instead. When the largest suitcase would not sink, he used a three and a half to four inch-long pocketknife to puncture holes in the suitcase so it would fill with water and sink. Petitioner claimed that all the stab wounds on the victim's body were thus inflicted post-mortem.

On cross-examination, petitioner admitted he lied to the police during the September 7, 2006, interview when he told them that the victim had left for North Carolina weeks before. He also admitted that the victim's boyfriend called him within minutes after the victim fell down the stairs, but he did not tell the boyfriend that the victim fell or needed an ambulance because she was already dead. The State then asked petitioner if he was concerned about his clients "when [he] didn't have a license to practice anymore?" Petitioner's counsel objected and moved for a mistrial on the ground that the State agreed pretrial not to raise the issue that petitioner had been practicing law without a license. The State argued petitioner's counsel opened the door

when petitioner said he did not call the police after the victim fell because he did not want to abandon his clients. The State further argued that the question went to petitioner's credibility, i.e., that he had not told his clients that he was practicing law without a law license. The circuit court ruled that petitioner opened the door and denied the motion for a mistrial. Petitioner then admitted that the State had suspended his law license because he had not complied with his mandatory continuing legal education reporting. He also admitted he did not tell his clients he was practicing law without a license. Petitioner further admitted that, in his letter to Linda Johnson, he did not say that the victim accidentally fell down the basement steps. Finally, petitioner admitted he did not call an ambulance when the victim fell down the steps, he dismembered the victim a day or two after she died, he cleaned up his basement to avoid detection, and he disposed of the hacksaw he used to cut up the victim's body.

Petitioner then called Dr. Bernard Lewis, a forensic psychologist, who testified that petitioner's stroke caused a decline in his intellectual functioning, a loss of memory, and made him prone to making poor judgments. Dr. Lewis also said that testing showed petitioner was a "helper" type and that he did not have a violent personality.

Following a five-day trial, the jury found petitioner guilty of the first-degree murder of the victim and did not recommend mercy. By order entered December 18, 2007, the circuit court denied petitioner's post-trial motions and sentenced him to life without the possibility of parole. The circuit court resentenced petitioner on January 3, 2017, to allow this appeal.

On appeal, petitioner raises seven assignments of error, most of which attack the circuit court's evidentiary rulings at trial. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). For example, in petitioner's first assignment of error, he argues that the circuit court abused its discretion in allowing John Carson, West Virginia's Chief Dental Examiner, to testify that an injury found on the victim's ear was, more likely than not, a bite wound caused by petitioner's prairie dog. Petitioner claims this evidence was not relevant under Rule 401 of the West Virginia Rules of Evidence because it was not probative of the victim's identity, which the police established through her dental records. Petitioner admits the prairie dog evidence may have had some slight probative value with regard to impeaching his statement to police during which he said the victim had gone to North Carolina; however, he argues that there was far superior probative evidence, such as the blood splatter that contained the victim's DNA in his basement. Petitioner also claims the prairie dog evidence was prejudicial under Rule 403 of the West Virginia Rules of Evidence because it was unnecessary to the State's case-in-chief. Finally, petitioner argues that the State entered the prairie dog evidence simply to enrage the jury.

We disagree and find the circuit court did not abuse its discretion in denying petitioner's motion to preclude the prairie dog evidence because that evidence was relevant for the purposes of establishing venue and jurisdiction. *See* Syl. Pt. 5, *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979) (The state must prove venue of the crime by a preponderance of the evidence.) Moreover, "[t]he judge and jury share responsibility for the ultimate determination of territorial jurisdiction in a criminal case involving controverted jurisdictional facts." Syl. Pt, 4, in part, *State v. Dennis*, 216 W.Va. 331, 607 S.E.2d 437 (2004). Here, the State faced a challenge in

finding evidence of the murder in petitioner's home given that significant time elapsed between the murder and the search of the home, and the fact that petitioner had cleaned up the scene, including painting his basement and burning evidence. Further, because the victim spent considerable time in petitioner's home, the small amount of blood splatter found in the basement that contained the victim's DNA could have been explained away as resulting from a prior injury. Therefore, the prairie dog evidence was plainly relevant to establishing that the murder occurred in petitioner's home. Accordingly, we find no error.

Petitioner next argues that the circuit court erred in allowing the State to admit into evidence at trial photographs taken during the victim's autopsy. Petitioner claims the photographs were graphic, gruesome, and unnecessary to the State's case-in-chief given that the State presented dental, forensic, and anthropological evidence to prove the victim's identity. Petitioner also claims the autopsy photographs did not aid the testimony of the Medical Examiner.

We first note that petitioner objected generally to the introduction of the autopsy photographs prior to and at trial. Likewise, on appeal, petitioner does not address any particular photograph by exhibit number and, instead, makes the generalized objection that the trial photographs were "graphic, gruesome, and unnecessary."[3] "The general rule is that pictures or photographs that are relevant to any issue in a case are admissible." *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W.Va. 492, 497, 345 S.E.2d 791, 796 (1986). Here, although the photos admitted at petitioner's trial were graphic, they were relevant because the State's forensic experts used them to explain how the victim was identified and the cause and manner of her death. Further, petitioner fails to demonstrate that the probative value of any one photograph was substantially outweighed by the risk of unfair prejudice. *See* Rule 403 of the West Virginia Rules of Evidence. Thus, we find the circuit court did not abuse its discretion in allowing the admission of the photographs at trial.

Petitioner's third assignment of error is that the circuit court erred in precluding petitioner from entering into evidence at trial the recording of the police interview of the victim's boyfriend, Paul Bronner.[4] After Mr. Bronner gave this statement, he left the State of West Virginia and, apparently, did not return. Pretrial, petitioner sought leave from the circuit court to admit Mr. Bronner's recorded statement into evidence at trial under West Virginia Rules of

---

[3] Petitioner initially supplied the Court with a disc containing 123 images that did not contain any reference to a trial exhibit number. However, on July 19, 2017, the Court granted petitioner's motion to file a supplemental appendix record that included 11 of the 123 photographic exhibits entered at trial; each of these photographs, taken during the victim's autopsy, contained an exhibit number. Specifically, the photographs show various views of the victim's head, torso, shoulder, arms, fingers, and legs, and the injuries thereto.

[4] Petitioner did not include a transcript of Mr. Bronner's statement to the police with his initial appendix record. However, as noted above, on July 19, 2017, the Court granted petitioner's motion to file a supplemental appendix record that contains a transcript of Mr. Bronner's statement to the police.

Evidence 803(24) and 804(5)(b)(S) (the residual evidence rule now found at Rule of Evidence 807). Petitioner summarized the content of Mr. Bronner's statement as demonstrating that,

> [Mr. Bronner] had known the Petitioner and [the victim] for 7 to 8 years and had spent a considerable amount of time with [the victim]; that he was aware of [the victim's] illegal drug (methamphetaruine) use and that she was an alcoholic (Bronner was a recovering alcoholic himself); that [the victim] was homeless, had no job or money (Bronner could have also confirmed at trial [the victim] would often sleep in her car, at his house or with strangers she met in bars); that [the victim] had no fixed address so the Petitioner allowed her to use his mailing address to renew her driver's license; that on the night of [the victim's] disappearance he had phoned the Petitioner to see how he and [the victim] were doing and to inquire if [the victim] had been successful in getting into a drug rehab; that [the victim] was difficult to deal with; that she would not leave Petitioner alone, constantly ask[ed] him for money and help; and that the Petitioner was a man of good character.

The circuit court found the following with regard to Mr. Bronner's statement:

> [It] appears to be largely comprised of hearsay in that it is [sic] statements and attitudes attributable to [petitioner] on the part of [Mr. Bronner]. It appears to be some sort of character evidence. Some of it is hearsay upon hearsay. . . . [S]ince [petitioner] has stated already that he plans to testify, it appears that [petitioner] himself would be a witness on these same points.

The State claims that it and the circuit court had concerns regarding the applicability of *Crawford v. Washington*, 541 U.S. 36 (2004) and *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006), to Mr. Bronner's statement.

Petitioner first argues that, because he was attempting to move the admission of the statement, there was no confrontation clause issue and, therefore, neither *Crawford*, nor *Mechling* applied. Petitioner claims that the only relevant factors were those enumerated in Rules 803 and 804 of the West Virginia Rules of Evidence regarding hearsay, and that Mr. Bronner's statement satisfied those rules. Petitioner next argues that Mr. Bronner's statement was trustworthy and contained evidence of petitioner's reputation for good character in the community, which is a hearsay rule exception found in Rule 803(20). Moreover, petitioner asserts he offered to redact those portions of the statement the State found to be "self-serving" and "hearsay." Third, petitioner avers the statement would have been offered to prove a material fact—petitioner's good character—which was material to a determination of mercy. Fourth, petitioner claims the statement was more probative on the issue of his good character than any other possible evidence, as Mr. Bronner was a close friend of both petitioner and the victim. Fifth, petitioner argues the admission of the statement comported with the general purpose of the Rules of Evidence, i.e., inclusion rather than exclusion in the interest of justice. Sixth, petitioner contends that the State had adequate notice of Mr. Bronner's statement. Finally, petitioner asserts that he demonstrated Mr. Bronner was truly unavailable. Thus, petitioner concludes that the circuit court abused its discretion by not allowing admission of Mr. Bronner's statement or

affording petitioner a continuance to obtain an out-of-state subpoena to secure Mr. Bronner's appearance at trial.

In Syllabus Point 5 of *State v. Smith*, 178 W.Va. 104, 358 S.E.2d 188 (1987), the Court determined the standard of review for the admission of evidence under the residual exception rule:

> The language of Rule 804(b)(5) of the West Virginia Rules of Evidence and its counterpart in Rule 803(24) requires that five general factors must be met in order for hearsay evidence to be admissible under the rules. First and most important is the trustworthiness of the statement, which must be equivalent to the trustworthiness underlying the specific exceptions to the hearsay rule. Second, the statement must be offered to prove a material fact. Third, the statement must be shown to be more probative on the issue for which it is offered than any other evidence the proponent can reasonably procure. Fourth, admission of the statement must comport with the general purpose of the rules of evidence and the interest of justice. Fifth, adequate notice of the statement must be afforded the other party to provide that party a fair opportunity to meet the evidence.

The circuit court's refusal to admit Mr. Bronner's statement was a proper exercise of its discretion because petitioner failed to satisfy *Smith* by demonstrating the trustworthiness, materiality, and probative value of the statement. With regarding to "trustworthiness," the circuit court correctly found Mr. Bonner's statement contained hearsay and was not corroborated by any other witness or by contemporaneous, corroborative evidence.

Here, the jury heard direct testimony from petitioner and other witnesses that the victim used drugs, consumed alcohol, and lived a transient lifestyle. Petitioner also testified regarding the financial and other aid he provided the victim. Further, petitioner called two fact witnesses who testified about their interactions with petitioner and their observations of his character. Thus, it is not evident that Mr. Bronner's statement was more probative on the issue of petitioner's character that of these other witnesses. Finally, some of the State's witnesses were acquainted with both petitioner and the victim. Therefore, petitioner could have solicited character testimony from one or more of them on cross-examination. Finally, Mr. Bronner's statement to the police was not taken under oath or subject to cross-examination. Thus, we find that the circuit court did not abuse its discretion in excluding Mr. Bronner's statement at trial.

Petitioner's fourth assignment of error is that the circuit court prejudiced him and denied him a fair trial when it allowed the State to inquire about petitioner's suspended law license despite the fact that the State agreed pretrial not to make such an inquiry during its case-in-chief. Petitioner argues that the evidence regarding his suspended law license was, in effect, Rule 404(b) evidence for which there was no *McGinnis*[5] hearing. Petitioner also argues that he did not "open the door" regarding his law license merely by testifying that he did not report the victim's death because he did not want to be arrested and thereby leave his clients without legal representation.

---

[5] *See* Syl. Pt. 2, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

We find petitioner's arguments to be without merit. Pretrial, the State agreed not to raise petitioner's lapsed law license during its case-in-chief unless petitioner opened the door, such as through a diminished capacity defense. In accordance with this agreement, the State did not raise petitioner's lapsed license during its case-in-chief. However, during petitioner's case-in-chief, he testified that he hid the victim's death because he did not want to leave his bankruptcy clients without legal representation. Thereafter, on cross-examination, the State challenged petitioner's law practice testimony on credibility grounds. Consequently, we find that the circuit court did not err in allowing the State to inquire about petitioner's lapsed law license because the State did so on cross-examination after petitioner opened the door. We also reject petitioner's claim that the evidence regarding his lapsed law license was Rule 404(b) evidence without a *McGinnis* hearing. Here, both parties discussed the evidence prior to trial, there was no dispute that petitioner's law license had lapsed, the evidence was made relevant by petitioner's own testimony, and petitioner was allowed to explain why his law license had lapsed. Thus, the probative value of the State's cross-examination was not substantially outweighed by any danger of unfair prejudice. Hence, we find the circuit court did not abuse its discretion in allowing the State to cross-examine petitioner in this regard.

Petitioner's fifth assignment of error is that the circuit court erred in allowing Dr. Haikal to testify beyond the opinions and conclusions contained in her autopsy report to petitioner's prejudice and surprise. Petitioner argues that under Rule 52(b) of the Rules of Criminal Procedure, it was plain error for the circuit court to allow the medical examiner to testify beyond the opinions and conclusions contained in her autopsy report. Specifically, petitioner cites to the medical examiner's testimony that two of the stab wounds on the victim's body were pre-mortem and that there were more stab wounds on the body than puncture holes to the suitcase. Petitioner claims the testimony surprised him because those two findings were not contained in Dr. Haikal's autopsy report, and that the report prejudiced him because he had not retained an expert to challenge those findings. Petitioner admits his counsel did not object to the two new findings, but argues the circuit court had a duty to correct this plain error by declaring a mistrial or by directing the jury to disregard this testimony and giving a cautionary instruction.

Because petitioner's counsel did not object to the evidence of which petitioner complains, we conduct a plain error analysis. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). Here, Dr. Haikal's report expressly provides that "[s]everal of the stab wounds may have been received postmortem in association with suitcase perforation by sharp implement(s)." Thus, it is clear that Dr. Haikal believed that some of the stab wounds occurred prior to the victim's death. Further, at a pre-trial conference, petitioner's counsel stated the he intended at trial to elicit testimony that all of the stabs were made post-mortem. Therefore, petitioner's counsel was aware that the timing of the wounds would be an issue at trial. Accordingly, petitioner could have retained his own expert to address the issue of the timing of the victim's wounds, but opted not to do so. Moreover, Dr. Haikal's report contains a detailed description of the stab wounds, including the number of wounds on the victim's body and the location of those wounds. Thus, the total number of stab wounds found by Dr. Haikal was available in her report. Similarly, the suitcase that contained the victim's torso was undoubtedly

available for inspection. Thus, petitioner's counsel could have counted the number of punctures in that suitcase as a means of countering the State's evidence. The difference in the number of wounds identified by Dr. Haikal and the number of punctures on the suitcase is a matter of simple arithmetic. Consequently, we find that Dr. Haikal's testimony regarding the nature and number of stab wounds found on the victim's body was consistent with, and within the scope of, her report. Accordingly, we find that petitioner's claim of prejudicial surprise lacks merit and does not rise to the level of plain error.

Petitioner's sixth assignment of error is that the circuit court erred in failing to direct a verdict for petitioner, or in failing to find that the jury's verdict was contrary to the evidence.

We have held,

> "'In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.' Syllabus Point 1, *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978)." Syllabus Point 10, *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992).

Syl. Pt. 13, *State v. George W.H.*, 190 W. Va. 558, 561–62, 439 S.E.2d 423, 426–27 (1993). Here, viewing the evidence in the light most favorable to the State, we do not find it manifestly inadequate or having caused an injustice. In fact, the evidence of petitioner's guilt at trial on the sole count of first-degree murder was more than sufficient to support a guilty verdict after the State concluded its case-in-chief. Therefore, we conclude that the circuit court did not err in refusing to direct a verdict for petitioner or in finding that the evidence supported the verdict.

Petitioner's seventh and final claim is that the cumulative error at trial deprived petitioner of a fair trial. *See State v. George W.H.*, 190 W.Va. 558, 439 S.E.2d 423 (1993). Having found no error, we reject petitioner's claim.

Accordingly, for the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** May 11, 2018

**CONCURRED IN BY:**
Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Men is E. Ketchum
Justice Allen H. Loughry II
Justice Elizabeth D. Walker